# LYNG, SECRETARY OF AGRICULTURE, ET AL. *v.* NORTHWEST INDIAN CEMETERY PRO- TECTIVE ASSOCIATION ET AL.

No. 86–1013. Argued November 30, 1987—Decided April 19, 1988

440

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 458. KENNEDY, J., took no part in the consideration or decision of the case.

*Andrew J. Pincus* argued the cause for petitioners. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Marzulla, Deputy Solicitor General Ayer, Robert L. Klarquist,* and *Jacques B. Gelin.*

*Marilyn B. Miles* argued the cause for respondents. With her on the brief for the Indian respondents was *Stephen V. Quesenberry. John K. Van de Kamp,* Attorney General, *R. H. Connett,* Assistant Attorney General, and *Edna Walz,* Deputy Attorney General filed a brief for respondent State of California.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to consider whether the First Amendment's Free Exercise Clause prohibits the Government from permitting timber harvesting in, or constructing a road through, a portion of a National Forest that has tradi-

---

*Briefs of *amici curiae* urging reversal were filed for the State of Hawaii et al. by *Kenneth O. Eikenberry,* Attorney General of Washington, *Timothy R. Malone, Nixon Handy,* and *Mark S. Green,* Assistant Attorneys General, *Warren Price III,* Attorney General of Hawaii, *Roger A. Tellinghuisen,* Attorney General of South Dakota, and *David Wilkinson,* Attorney General of Utah; for the Colorado Mining Association et al. by *Lawrence E. Stevens* and *Patrick J. Garver;* for the Howonquet Community Association et al. by *Ronald A. Zumbrun* and *Robin L. Rivett;* and for the city of Williams, Arizona, by *Gary Verburg.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation et al. by *John A. Powell, Steven R. Shapiro, Paul L. Hoffman, Mark D. Rosenbaum, Alan L. Schlosser, Edward M. Chen, Matthew A. Coles,* and *Stephen L. Pevar;* for the American Jewish Congress et al. by *Marc D. Stern, Lois C. Waldman,* and *Amy Adelson;* and for the Christian Legal Society et al. by *Michael J. Woodruff, Samuel Rabinove, Richard T. Foltin,* and *Jordan Lorence.*

*Steven C. Moore* filed a brief for the National Congress of American Indians et al. as *amici curiae.*

tionally been used for religious purposes by members of three American Indian tribes in northwestern California. We conclude that it does not.

## I

As part of a project to create a paved 75-mile road linking two California towns, Gasquet and Orleans, the United States Forest Service has upgraded 49 miles of previously unpaved roads on federal land. In order to complete this project (the G-O road), the Forest Service must build a 6-mile paved segment through the Chimney Rock section of the Six Rivers National Forest. That section of the forest is situated between two other portions of the road that are already complete.

In 1977, the Forest Service issued a draft environmental impact statement that discussed proposals for upgrading an existing unpaved road that runs through the Chimney Rock area. In response to comments on the draft statement, the Forest Service commissioned a study of American Indian cultural and religious sites in the area. The Hoopa Valley Indian Reservation adjoins the Six Rivers National Forest, and the Chimney Rock area has historically been used for religious purposes by Yurok, Karok, and Tolowa Indians. The commissioned study, which was completed in 1979, found that the entire area "is significant as an integral and indispensable part of Indian religious conceptualization and practice." App. 181. Specific sites are used for certain rituals, and "successful use of the [area] is dependent upon and facilitated by certain qualities of the physical environment, the most important of which are privacy, silence, and an undisturbed natural setting." *Ibid.* (footnote omitted). The study concluded that constructing a road along any of the available routes "would cause serious and irreparable damage to the sacred areas which are an integral and necessary part of the belief systems and lifeway of Northwest California Indian peoples." *Id.*, at 182. Accordingly, the report recommended that the G-O road not be completed.

In 1982, the Forest Service decided not to adopt this recommendation, and it prepared a final environmental impact statement for construction of the road.   The Regional Forester selected a route that avoided archeological sites and was removed as far as possible from the sites used by contemporary Indians for specific spiritual activities.   Alternative routes that would have avoided the Chimney Rock area altogether were rejected because they would have required the acquisition of private land, had serious soil stability problems, and would in any event have traversed areas having ritualistic value to American Indians.   See *id.*, at 217–218. At about the same time, the Forest Service adopted a management plan allowing for the harvesting of significant amounts of timber in this area of the forest.   The management plan provided for one-half mile protective zones around all the religious sites identified in the report that had been commissioned in connection with the G-O road.

After exhausting their administrative remedies, respondents — an Indian organization, individual Indians, nature organizations and individual members of those organizations, and the State of California—challenged both the road-building and timber-harvesting decisions in the United States District Court for the Northern District of California.   Respondents claimed that the Forest Service's decisions violated the Free Exercise Clause, the Federal Water Pollution Control Act (FWPCA), 86 Stat. 896, as amended, 33 U. S. C. § 1251 *et seq.*, the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*, several other federal statutes, and governmental trust responsibilities to Indians living on the Hoopa Valley Reservation.

After a trial, the District Court issued a permanent injunction prohibiting the Government from constructing the Chimney Rock section of the G-O road or putting the timber-harvesting management plan into effect.   See *Northwest Indian Cemetery Protective Assn.* v. *Peterson,* 565 F. Supp. 586 (1983).   The court found that both actions would violate

the Free Exercise Clause because they "would seriously damage the salient visual, aural, and environmental qualities of the high country." *Id.*, at 594–595. The court also found that both proposed actions would violate the FWPCA, and that the environmental impact statements for construction of the road were deficient under the NEPA. Finally, the court concluded that both projects would breach the Government's trust responsibilities to protect water and fishing rights reserved to the Hoopa Valley Indians.

While an appeal was pending before the United States Court of Appeals for the Ninth Circuit, Congress enacted the California Wilderness Act of 1984, Pub. L. 98–425, 98 Stat. 1619. Under that statute, much of the property covered by the Forest Service's management plan is now designated a wilderness area, which means that commercial activities such as timber harvesting are forbidden. The statute exempts a narrow strip of land, coinciding with the Forest Service's proposed route for the remaining segment of the G–O road, from the wilderness designation. The legislative history indicates that this exemption was adopted "to enable the completion of the Gasquet-Orleans Road project if the responsible authorities so decide." S. Rep. No. 98–582, p. 29 (1984). The existing unpaved section of road, however, lies within the wilderness area and is therefore now closed to general traffic.

A panel of the Ninth Circuit affirmed in part. *Northwest Indian Cemetery Protective Assn.* v. *Peterson*, 795 F. 2d 688 (1986). The panel unanimously rejected the District Court's conclusion that the Government's proposed actions would breach its trust responsibilities to Indians on the Hoopa Valley Reservation. The panel also vacated the injunction to the extent that it had been rendered moot by the California Wilderness Act, which now prevents timber harvesting in certain areas covered by the District Court's order. The District Court's decision, to the extent that it rested on statutory grounds, was otherwise unanimously affirmed.

By a divided decision, the District Court's constitutional ruling was also affirmed. Relying primarily on the Forest Service's own commissioned study, the majority found that construction of the Chimney Rock section of the G-O road would have significant, though largely indirect, adverse effects on Indian religious practices. The majority concluded that the Government had failed to demonstrate a compelling interest in the completion of the road, and that it could have abandoned the road without thereby creating "a religious preserve for a single group in violation of the establishment clause." *Id.*, at 694. The majority apparently applied the same analysis to logging operations that might be carried out in portions of the Chimney Rock area not covered by the California Wilderness Act. See *id.*, at 692–693 ("Because most of the high country has now been designated by Congress as a wilderness area, the issue of logging becomes less significant, although it does not disappear").

The dissenting judge argued that certain of the adverse effects on the Indian respondents' religious practices could be eliminated by less drastic measures than a ban on building the road, and that other actual or suggested adverse effects did not pose a serious threat to the Indians' religious practices. He also concluded that the injunction against timber harvesting needed to be reconsidered in light of the California Wilderness Act: "It is not clear whether the district court would have issued an injunction based upon the development of the remaining small parcels. Accordingly, I would remand to allow the district court to reevaluate its injunction in light of the Act." *Id.*, at 704.

## II

We begin by noting that the courts below did not articulate the bases of their decisions with perfect clarity. A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them. See *Three*

*Affiliated Tribes of Ft. Berthold Reservation* v. *Wold Engineering, P. C.,* 467 U. S. 138, 157–158 (1984); see also, *e. g., Jean* v. *Nelson,* 472 U. S. 846, 854 (1985); *Gulf Oil Co.* v. *Bernard,* 452 U. S. 89, 99 (1981); *Ashwander* v. *TVA,* 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring). This principle required the courts below to determine, before addressing the constitutional issue, whether a decision on that question could have entitled respondents to relief beyond that to which they were entitled on their statutory claims. If no additional relief would have been warranted, a constitutional decision would have been unnecessary and therefore inappropriate.

Neither the District Court nor the Court of Appeals explained or expressly articulated the necessity for their constitutional holdings. Were we persuaded that those holdings were unnecessary, we could simply vacate the relevant portions of the judgment below without discussing the merits of the constitutional issue. The structure and wording of the District Court's injunctive order, however, suggest that the statutory holdings would not have supported all the relief granted. The order is divided into four sections. Two of those sections deal with a 31,100-acre tract referred to as the Blue Creek Roadless Area. The injunction prohibits the Forest Service from engaging in timber harvesting or road building anywhere on the tract "unless and until" compliance with the NEPA and the FWPCA have been demonstrated. 565 F. Supp., at 606–607. The sections of the injunction dealing with the smaller Chimney Rock area (*i. e.,* the area affected by the First Amendment challenge) are worded differently. The Forest Service is permanently enjoined, without any qualifying language, from constructing the proposed portion of the G–O road "and/or *any alternative route*" through that area; similarly, the injunction forbids timber harvesting or the construction of logging roads in the Chimney Rock area pursuant to the Forest Service's proposed management plan "or *any other land management plan.*"

*Id.,* at 606 (emphasis added). These differences in wording suggest, without absolutely implying, that an injunction covering the Chimney Rock area would in some way have been conditional, or narrower in scope, if the District Court had not decided the First Amendment issue as it did. Similarly, the silence of the Court of Appeals as to the necessity of reaching the First Amendment issue may have reflected its understanding that the District Court's injunction necessarily rested in part on constitutional grounds.

Because it appears reasonably likely that the First Amendment issue was necessary to the decisions below, we believe that it would be inadvisable to vacate and remand without addressing that issue on the merits. This conclusion is strengthened by considerations of judicial economy. The Government, which petitioned for certiorari on the constitutional issue alone, has informed us that it believes it can cure the statutory defects identified below, intends to do so, and will not challenge the adverse statutory rulings. Tr. of Oral Arg. 9–10. In this circumstance, it is difficult to see what principle would be vindicated by sending this case on what would almost certainly be a brief round trip to the courts below.

## III

### A

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." It is undisputed that the Indian respondents' beliefs are sincere and that the Government's proposed actions will have severe adverse effects on the practice of their religion. Those respondents contend that the burden on their religious practices is heavy enough to violate the Free Exercise Clause unless the Government can demonstrate a compelling need to complete the G-O road or to engage in timber harvesting in the Chimney Rock area. We disagree.

In *Bowen* v. *Roy*, 476 U. S. 693 (1986), we considered a challenge to a federal statute that required the States to use Social Security numbers in administering certain welfare programs. Two applicants for benefits under these programs contended that their religious beliefs prevented them from acceding to the use of a Social Security number for their 2-year-old daughter because the use of a numerical identifier would " 'rob the spirit' of [their] daughter and prevent her from attaining greater spiritual power." *Id.*, at 696. Similarly, in this case, it is said that disruption of the natural environment caused by the G-O road will diminish the sacredness of the area in question and create distractions that will interfere with "training and ongoing religious experience of individuals using [sites within] the area for personal medicine and growth . . . and as integrated parts of a system of religious belief and practice which correlates ascending degrees of personal power with a geographic hierarchy of power." App. 181. Cf. *id.*, at 178 ("Scarred hills and mountains, and disturbed rocks destroy the purity of the sacred areas, and [Indian] consultants repeatedly stressed the need of a training doctor to be undistracted by such disturbance"). The Court rejected this kind of challenge in *Roy:*

> "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. Just as the Government may not insist that [the Roys] engage in any set form of religious observance, so [they] may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter. . . .
>
> ". . . The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." 476 U. S., at 699–700.

The building of a road or the harvesting of timber on publicly owned land cannot meaningfully be distinguished from the use of a Social Security number in *Roy*. In both cases, the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs. In neither case, however, would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens.

We are asked to distinguish this case from *Roy* on the ground that the infringement on religious liberty here is "significantly greater," or on the ground that the Government practice in *Roy* was "purely mechanical" whereas this case involves "a case-by-case substantive determination as to how a particular unit of land will be managed." Brief for Indian Respondents 33–34. Similarly, we are told that this case can be distinguished from *Roy* because "the government action is not at some physically removed location where it places no restriction on what a practitioner may do." Brief for Respondent State of California 18. The State suggests that the Social Security number in *Roy* "could be characterized as interfering with Roy's religious tenets from a subjective point of view, where the government's conduct of 'its own internal affairs' was known to him only secondhand and did not interfere with his ability to practice his religion." *Id.*, at 19 (footnote omitted; internal citation omitted). In this case, however, it is said that the proposed road will "physically destro[y] the environmental conditions and the privacy without which the [religious] practices cannot be conducted." *Ibid.*

These efforts to distinguish *Roy* are unavailing. This Court cannot determine the truth of the underlying beliefs that led to the religious objections here or in *Roy*, see *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 144, n. 9 (1987), and accordingly cannot weigh the adverse ef-

fects on the appellees in *Roy* and compare them with the adverse effects on the Indian respondents. Without the ability to make such comparisons, we cannot say that the one form of incidental interference with an individual's spiritual activities should be subjected to a different constitutional analysis than the other.

Respondents insist, nonetheless, that the courts below properly relied on a factual inquiry into the degree to which the Indians' spiritual practices would become ineffectual if the G-O road were built. They rely on several cases in which this Court has sustained free exercise challenges to government programs that interfered with individuals' ability to practice their religion. See *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972) (compulsory school-attendance law); *Sherbert* v. *Verner*, 374 U. S. 398 (1963) (denial of unemployment benefits to applicant who refused to accept work requiring her to violate the Sabbath); *Thomas* v. *Review Board, Indiana Employment Security Div.*, 450 U. S. 707 (1981) (denial of unemployment benefits to applicant whose religion forbade him to fabricate weapons); *Hobbie, supra* (denial of unemployment benefits to religious convert who resigned position that required her to work on the Sabbath).

Even apart from the inconsistency between *Roy* and respondents' reading of these cases, their interpretation will not withstand analysis. It is true that this Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment. Thus, for example, ineligibility for unemployment benefits, based solely on a refusal to violate the Sabbath, has been analogized to a fine imposed on Sabbath worship. *Sherbert, supra,* at 404. This does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justifica-

tion for its otherwise lawful actions. The crucial word in the constitutional text is "prohibit": "For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Sherbert, supra*, at 412 (Douglas, J., concurring).

Whatever may be the exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs, the location of the line cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. The Government does not dispute, and we have no reason to doubt, that the logging and road-building projects at issue in this case could have devastating effects on traditional Indian religious practices. Those practices are intimately and inextricably bound up with the unique features of the Chimney Rock area, which is known to the Indians as the "high country." Individual practitioners use this area for personal spiritual development; some of their activities are believed to be critically important in advancing the welfare of the Tribe, and indeed, of mankind itself. The Indians use this area, as they have used it for a very long time, to conduct a wide variety of specific rituals that aim to accomplish their religious goals. According to their beliefs, the rituals would not be efficacious if conducted at other sites than the ones traditionally used, and too much disturbance of the area's natural state would clearly render any meaningful continuation of traditional practices impossible. To be sure, the Indians themselves were far from unanimous in opposing the G-O road, see App. 180, and it seems less than certain that construction of the road will be so disruptive that it will doom their religion. Nevertheless, we can assume that the threat to the efficacy of at least some religious practices is extremely grave.

Even if we assume that we should accept the Ninth Circuit's prediction, according to which the G-O road will "virtually destroy the . . . Indians' ability to practice their religion,"

795 F. 2d, at 693 (opinion below), the Constitution simply does not provide a principle that could justify upholding respondents' legal claims. However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions. Cf. The Federalist No. 10 (suggesting that the effects of religious factionalism are best restrained through competition among a multiplicity of religious sects).

One need not look far beyond the present case to see why the analysis in *Roy*, but not respondents' proposed extension of *Sherbert* and its progeny, offers a sound reading of the Constitution. Respondents attempt to stress the limits of the religious servitude that they are now seeking to impose on the Chimney Rock area of the Six Rivers National Forest. While defending an injunction against logging operations and the construction of a road, they apparently do not *at present* object to the area's being used by recreational visitors, other Indians, or forest rangers. Nothing in the principle for which they contend, however, would distinguish this case from another lawsuit in which they (or similarly situated religious objectors) might seek to exclude all human activity but

their own from sacred areas of the public lands. The Indian respondents insist that "*[p]rivacy* during the power quests is required for the practitioners to maintain the purity needed for a successful journey." Brief for Indian Respondents 8 (emphasis added; citation to record omitted). Similarly: "The practices conducted in the high country entail intense meditation and require the practitioner to achieve a profound awareness of the natural environment. Prayer seats are oriented so there is an unobstructed view, and the practitioner must be surrounded by *undisturbed* naturalness." *Id.*, at 8, n. 4 (emphasis added; citations to record omitted). No disrespect for these practices is implied when one notes that such beliefs could easily require *de facto* beneficial ownership of some rather spacious tracts of public property. Even without anticipating future cases, the diminution of the Government's property rights, and the concomitant subsidy of the Indian religion, would in this case be far from trivial: the District Court's order permanently forbade commercial timber harvesting, or the construction of a two-lane road, anywhere within an area covering a full 27 sections (*i. e.* more than 17,000 acres) of public land.

The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred, and a law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions. Whatever rights the Indians may have to the use of the area, however, those rights do not divest the Government of its right to use what is, after all, *its* land. Cf. *Bowen* v. *Roy*, 476 U. S., at 724–727 (O'CONNOR, J., concurring in part and dissenting in part) (distinguishing between the Government's use of information in its possession and the Government's requiring an individual to provide such information).

## B

Nothing in our opinion should be read to encourage governmental insensitivity to the religious needs of any citizen.

The Government's rights to the use of its own land, for example, need not and should not discourage it from accommodating religious practices like those engaged in by the Indian respondents. Cf. *Sherbert*, 374 U. S., at 422–423 (Harlan, J., dissenting). It is worth emphasizing, therefore, that the Government has taken numerous steps in this very case to minimize the impact that construction of the G-O road will have on the Indians' religious activities. First, the Forest Service commissioned a comprehensive study of the effects that the project would have on the cultural and religious value of the Chimney Rock area. The resulting 423-page report was so sympathetic to the Indians' interests that it has constituted the principal piece of evidence relied on by respondents throughout this litigation.

Although the Forest Service did not in the end adopt the report's recommendation that the project be abandoned, many other ameliorative measures were planned. No sites where specific rituals take place were to be disturbed. In fact, a major factor in choosing among alternative routes for the road was the relation of the various routes to religious sites: the route selected by the Regional Forester is, he noted, "the farthest removed from contemporary spiritual sites; thus, the adverse audible intrusions associated with the road would be less than all other alternatives." App. 102. Nor were the Forest Service's concerns limited to "audible intrusions." As the dissenting judge below observed, 10 specific steps were planned to reduce the visual impact of the road on the surrounding country. See 795 F. 2d, at 703 (Beezer, J., dissenting in part).

Except for abandoning its project entirely, and thereby leaving the two existing segments of road to dead-end in the middle of a National Forest, it is difficult to see how the Government could have been more solicitous. Such solicitude accords with "the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional re-

ligions of the American Indian . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." American Indian Religious Freedom Act (AIRFA), Pub. L. 95–341, 92 Stat. 469, 42 U. S. C. § 1996.

Respondents, however, suggest that AIRFA goes further and in effect enacts their interpretation of the First Amendment into statutory law. Although this contention was rejected by the District Court, they seek to defend the judgment below by arguing that AIRFA authorizes the injunction against completion of the G-O road. This argument is without merit. After reciting several legislative findings, AIRFA "resolves" upon the policy quoted above. A second section of the statute, 92 Stat. 470, required an evaluation of federal policies and procedures, in consultation with native religious leaders, of changes necessary to protect and preserve the rights and practices in question. The required report dealing with this evaluation was completed and released in 1979. Reply Brief for Petitioners 2, n. 3. Nowhere in the law is there so much as a hint of any intent to create a cause of action or any judicially enforceable individual rights.

What is obvious from the face of the statute is confirmed by numerous indications in the legislative history. The sponsor of the bill that became AIRFA, Representative Udall, called it "a sense of Congress joint resolution," aimed at ensuring that "the basic right of the Indian people to exercise their traditional religious practices is not infringed without a clear decision on the part of the Congress or the administrators that such religious practices must yield to some higher consideration." 124 Cong. Rec. 21444 (1978). Representative Udall emphasized that the bill would not "confer special religious rights on Indians," would "not change any existing State or Federal law," and in fact "has no teeth in it." Id., at 21444–21445.

## C

The dissent proposes an approach to the First Amendment that is fundamentally inconsistent with the principles on which our decision rests. Notwithstanding the sympathy that we all must feel for the plight of the Indian respondents, it is plain that the approach taken by the dissent cannot withstand analysis. On the contrary, the path towards which it points us is incompatible with the text of the Constitution, with the precedents of this Court, and with a responsible sense of our own institutional role.

The dissent begins by asserting that the "constitutional guarantee we interpret today . . . is directed against *any* form of government action that frustrates or inhibits religious practice." *Post*, at 459 (emphasis added). The Constitution, however, says no such thing. Rather, it states: "Congress shall make no law . . . *prohibiting* the free exercise [of religion]." U. S. Const., Amdt. 1 (emphasis added).

As we explained above, *Bowen* v. *Roy* rejected a First Amendment challenge to Government activities that the religious objectors sincerely believed would "'"rob the spirit" of [their] daughter and prevent her from attaining greater spiritual power.'" See *supra*, at 448 (quoting *Roy*, 476 U. S., at 696). The dissent now offers to distinguish that case by saying that the Government was acting there "in a purely internal manner," whereas land-use decisions "are likely to have substantial external effects." *Post*, at 470. Whatever the source or meaning of the dissent's distinction, it has no basis in *Roy*. Robbing the spirit of a child, and preventing her from attaining greater spiritual power, is both a "substantial external effect" and one that is remarkably similar to the injury claimed by respondents in the case before us today. The dissent's reading of *Roy* would effectively overrule that decision, without providing any compelling justification for doing so.

The dissent also misreads *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972). The statute at issue in that case prohibited the

Amish parents, on pain of criminal prosecution, from providing their children with the kind of education required by the Amish religion. *Id.*, at 207–209, 223. The statute directly compelled the Amish to send their children to public high schools "contrary to the Amish religion and way of life." *Id.*, at 209. The Court acknowledged that the statute might be constitutional, *despite* its coercive nature, if the State could show with sufficient "particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish." *Id.*, at 236 (citation omitted). The dissent's out-of-context quotations notwithstanding, there is nothing whatsoever in the *Yoder* opinion to support the proposition that the "impact" on the Amish religion would have been constitutionally problematic if the statute at issue had not been coercive in nature. Cf. *post*, at 466.

Perceiving a "stress point in the longstanding conflict between two disparate cultures," the dissent attacks us for declining to "balanc[e] these competing and potentially irreconcilable interests, choosing instead to turn this difficult task over to the Federal Legislature." *Post*, at 473. Seeing the Court as the arbiter, the dissent proposes a legal test under which it would decide which public lands are "central" or "indispensable" to which religions, and by implication which are "dispensable" or "peripheral," and would then decide which government programs are "compelling" enough to justify "infringement of those practices." *Post*, at 475. We would accordingly be required to weigh the value of every religious belief and practice that is said to be threatened by any government program. Unless a "showing of 'centrality,'" *post*, at 474, is nothing but an assertion of centrality, see *post*, at 475, the dissent thus offers us the prospect of this Court's holding that some sincerely held religious beliefs and practices are not "central" to certain religions, despite protestations to the contrary from the religious objectors who brought the lawsuit. In other words, the dissent's approach would

require us to rule that some religious adherents misunderstand their own religious beliefs. We think such an approach cannot be squared with the Constitution or with our precedents, and that it would cast the Judiciary in a role that we were never intended to play.

## IV

The decision of the court below, according to which the First Amendment precludes the Government from completing the G-O road or from permitting timber harvesting in the Chimney Rock area, is reversed. In order that the District Court's injunction may be reconsidered in light of this holding, and in the light of any other relevant events that may have intervened since the injunction issued, the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

"'[T]he Free Exercise Clause,'" the Court explains today, "'is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" *Ante*, at 451 (quoting *Sherbert* v. *Verner*, 374 U. S. 398, 412 (1963) (Douglas, J., concurring)). Pledging fidelity to this unremarkable constitutional principle, the Court nevertheless concludes that even where the Government uses federal land in a manner that threatens the very existence of a Native American religion, the Government is simply not *"doing"* anything to the practitioners of that faith. Instead, the Court believes that Native Americans who request that the Government refrain from destroying their religion effectively seek to exact from the Government *de facto* beneficial ownership of federal property. These two astonishing conclusions follow naturally from the Court's deter-

mination that federal land-use decisions that render the practice of a given religion impossible do not burden that religion in a manner cognizable under the Free Exercise Clause, because such decisions neither coerce conduct inconsistent with religious belief nor penalize religious activity. The constitutional guarantee we interpret today, however, draws no such fine distinctions between types of restraints on religious exercise, but rather is directed against any form of governmental action that frustrates or inhibits religious practice. Because the Court today refuses even to acknowledge the constitutional injury respondents will suffer, and because this refusal essentially leaves Native Americans with absolutely no constitutional protection against perhaps the gravest threat to their religious practices, I dissent.

I

For at least 200 years and probably much longer, the Yurok, Karok, and Tolowa Indians have held sacred an approximately 25-square-mile area of land situated in what is today the Blue Creek Unit of Six Rivers National Forest in northwestern California. As the Government readily concedes, regular visits to this area, known to respondent Indians as the "high country," have played and continue to play a "critical" role in the religious practices and rituals of these Tribes. Brief for Petitioners 3. Those beliefs, only briefly described in the Court's opinion, are crucial to a proper understanding of respondents' claims.

As the Forest Service's commissioned study, the Theodoratus Report, explains, for Native Americans religion is not a discrete sphere of activity separate from all others, and any attempt to isolate the religious aspects of Indian life "is in reality an exercise which forces Indian concepts into non-Indian categories." App. 110; D. Theodoratus, Cultural Resources of the Chimney Rock Section, Gasquet-Orleans Road, Six Rivers National Forest (1979). Thus, for most Native Americans, "[t]he area of worship cannot be delineated from

social, political, cultur[al], and other areas o[f] Indian life-style." American Indian Religious Freedom, Hearings on S. J. Res. 102 before the Senate Select Committee on Indian Affairs, 95th Cong., 2d Sess., 86 (1978) (statement of Barney Old Coyote, Crow Tribe). A pervasive feature of this life-style is the individual's relationship with the natural world; this relationship, which can accurately though somewhat in-completely be characterized as one of stewardship, forms the core of what might be called, for want of a better nomencla-ture, the Indian religious experience. While traditional Western religions view creation as the work of a deity "who institutes natural laws which then govern the operation of physical nature," tribal religions regard creation as an on-going process in which they are morally and religiously obli-gated to participate. U. S. Federal Agencies Task Force, American Indian Religious Freedom Act Report 11 (1979) (Task Force Report). Native Americans fulfill this duty through ceremonies and rituals designed to preserve and sta-bilize the earth and to protect humankind from disease and other catastrophes. Failure to conduct these ceremonies in the manner and place specified, adherents believe, will result in great harm to the earth and to the people whose welfare depends upon it. *Id.*, at 10.

In marked contrast to traditional Western religions, the belief systems of Native Americans do not rely on doctrines, creeds, or dogmas. Established or universal truths—the mainstay of Western religions—play no part in Indian faith. Ceremonies are communal efforts undertaken for specific purposes in accordance with instructions handed down from generation to generation. Commentaries on or interpreta-tions of the rituals themselves are deemed absolute viola-tions of the ceremonies, whose value lies not in their ability to explain the natural world or to enlighten individual be-lievers but in their efficacy as protectors and enhancers of tribal existence. *Ibid.* Where dogma lies at the heart of Western religions, Native American faith is inextricably

bound to the use of land. The site-specific nature of Indian religious practice derives from the Native American perception that land is itself a sacred, living being. See Suagee, American Indian Religious Freedom and Cultural Resources Management: Protecting Mother Earth's Caretakers, 10 Am. Ind. L. Rev. 1, 10 (1982). Rituals are performed in prescribed locations not merely as a matter of traditional orthodoxy, but because land, like all other living things, is unique, and specific sites possess different spiritual properties and significance. Within this belief system, therefore, land is not fungible; indeed, at the time of the Spanish colonization of the American Southwest, "all . . . Indians held in some form a belief in a sacred and indissoluble bond between themselves and the land in which their settlements were located." E. Spicer, Cycles of Conquest: The Impact of Spain, Mexico, and the United States on the Indians of the Southwest, 1533–1960, p. 576 (1962).

For respondent Indians, the most sacred of lands is the high country where, they believe, prehuman spirits moved with the coming of humans to the Earth. Because these spirits are seen as the source of religious power, or "medicine," many of the tribes' rituals and practices require frequent journeys to the area. Thus, for example, religious leaders preparing for the complex of ceremonies that underlie the Tribes' World Renewal efforts must travel to specific sites in the high country in order to attain the medicine necessary for successful renewal. Similarly, individual tribe members may seek curative powers for the healing of the sick, or personal medicine for particular purposes such as good luck in singing, hunting, or love. A period of preparation generally precedes such visits, and individuals must select trails in the sacred area according to the medicine they seek and their abilities, gradually moving to increasingly more powerful sites, which are typically located at higher altitudes. Among the most powerful of sites are Chimney Rock, Doctor Rock, and Peak 8, all of which are elevated rock outcroppings.

462

According to the Theodoratus Report, the qualities "of silence, the aesthetic perspective, and the physical attributes, are an extension of the sacredness of [each] particular site." App. 148. The act of medicine making is akin to meditation: the individual must integrate physical, mental, and vocal actions in order to communicate with the prehuman spirits. As a result, "successful use of the high country is dependent upon and facilitated by certain qualities of the physical environment, the most important of which are privacy, silence, and an undisturbed natural setting." *Id.*, at 181. Although few Tribe members actually make medicine at the most powerful sites, the entire Tribe's welfare hinges on the success of the individual practitioners.

Beginning in 1972, the Forest Service began preparing a multiple-use management plan for the Blue Creek Unit. The plan's principal features included the harvesting of 733 million board feet of Douglas fir over an 80-year period and the completion of a 6-mile segment of paved road running between two northern California towns, Gasquet and Orleans (the G-O road). The road's primary purpose was to provide a route for hauling the timber harvested under the management plan; in addition, it would enhance public access to the Six Rivers and other national forests, and allow for more efficient maintenance and fire control by the Forest Service itself. In the mid-1970's, the Forest Service circulated draft environmental impact statements evaluating the effects of several proposed routes for the final segment of the G-O road, including at least two that circumnavigated the high country altogether. Ultimately, however, the Service settled on a route running along the Chimney Rock Corridor, which traverses the Indians' sacred lands.

Respondent Indians brought suit to enjoin implementation of the plan, alleging that the road construction and timber harvesting would impermissibly interfere with their religious practices in violation of the Free Exercise Clause of the First

Amendment.[1] Following a trial, the District Court granted the requested injunctive relief. The court found that "use of the high country is essential to [respondents'] 'World Renewal' ceremonies . . . which constitute the heart of the Northwest Indian religious belief system," and that " '[i]ntrusions on the sanctity of the Blue Creek high country are . . . potentially destructive of the very core of Northwest [Indian] religious beliefs and practices.' " *Northwest Indian Cemetery Protective Assn.* v. *Peterson,* 565 F. Supp. 586, 594–595 (ND Cal. 1983) (quoting the Theodoratus Report, at 420). Concluding that these burdens on respondents' religious practices were sufficient to trigger the protections of the Free Exercise Clause, the court found that the interests served by the G-O road and the management plan were insufficient to justify those burdens. In particular, the court found that the road would not improve access to timber resources in the Blue Creek Unit and indeed was unnecessary to the harvesting of that timber; that it would not significantly improve the administration of the Six Rivers National Forest; and that it would increase recreational access only marginally, and at the expense of the very pristine environment that makes the area suitable for primitive recreational use in the first place. 565 F. Supp., at 595–596. The court further found that the unconnected segments of the road had independent utility,[2] and that although completion of the

---

[1] Respondent Indians were joined in this suit by the State of California as well as various environmental groups. For the sake of simplicity, I use the term "respondents" to refer exclusively to the affected Native American religious practitioners.

[2] The Court overlooks this finding when it suggests that the only protective measure the Service did not take was the untenable one of "abandoning its project entirely, and thereby leaving the two existing segments of road to dead-end in the middle of a National Forest." *Ante,* at 454. Far from finding that option untenable, the District Court expressly concluded that the segments had independent economic and administrative utility, and thus that past investments in the paved sections did not justify construction of the Chimney Rock segment. See 565 F. Supp., at 596.

Chimney Rock segment would reduce timber-hauling costs, it would not generate new jobs but would instead merely shift work from one area of the region to another. *Id.*, at 596. Finally, in enjoining the proposed harvesting activities, the court found that the Blue Creek Unit's timber resources were but a small fraction of those located in the entire National Forest and that the local timber industry would not suffer seriously if access to this fraction were foreclosed. *Ibid.*

While the case was pending on appeal before the Court of Appeals for the Ninth Circuit, Congress passed the California Wilderness Act of 1984, Pub. L. 98–425, 98 Stat. 1619, which designates most of the the Blue Creek Unit a wilderness area, and thus precludes logging and all other commercial activities in most of the area covered by the Forest Service's management plan. Thereafter, the Court of Appeals affirmed the District Court's determination that the proposed harvesting and construction activities violated respondents' constitutional rights. Recognizing that the high country is "indispensable" to the religious lives of the approximately 5,000 Tribe members who reside in the area, *Northwest Indian Cemetery Protective Assn.* v. *Peterson*, 795 F. 2d 688, 692 (1986), the court concluded "that the proposed government operations would *virtually destroy the . . . Indians' ability to practice their religion.*" *Id.*, at 693 (emphasis added).[3] Like the lower court, the Court of Appeals found

---

[3] Remarkably, the Court treats this factual determination as nothing more than an assumption or "prediction," *ante*, at 451, and suggests that it is "less than certain that construction of the road will be so disruptive that it will doom [respondents'] religion." *Ibid.* Such speculation flies in the face of the most basic principles of appellate review, see Fed. Rule Civ. Proc. 52(a) ("Findings of fact . . . shall not be set aside unless clearly erroneous"), and is wholly at odds with the well-settled rule that this Court will not disturb findings of facts agreed upon by both lower courts unless those findings are clearly in error. *United States* v. *Ceccolini*, 435 U. S. 268, 273 (1978). Even if our review were not governed by such rules, however, the mere fact that a handful of the Native Americans who reside in the

the Government's interests in building the road and permitting limited timber harvesting—interests which of course were considerably undermined by passage of the California Wilderness Act—did not justify the destruction of respondents' religion. *Id.,* at 695.

## II

The Court does not for a moment suggest that the interests served by the G-O road are in any way compelling, or that they outweigh the destructive effect construction of the road will have on respondents' religious practices. Instead, the Court embraces the Government's contention that its prerogative as landowner should always take precedence over a claim that a particular use of federal property infringes religious practices. Attempting to justify this rule, the Court argues that the First Amendment bars only outright prohibitions, indirect coercion, and penalties on the free exercise of religion. All other "incidental effects of government programs," it concludes, even those "which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," simply do not give rise to constitutional concerns. See *ante,* at 450. Since our recognition nearly half a century ago that restraints on religious conduct implicate the concerns of the Free Exercise Clause, see *Prince* v. *Massachusetts,* 321 U. S. 158 (1944), we have never suggested that the protections of the guarantee are limited to so narrow a range of governmental burdens. The land-use decision challenged here will restrain respondents from practicing their religion as surely and as completely as any of the governmental actions we have struck down in the past, and the Court's efforts simply to define away respondents' in-

affected area do not oppose the road in no way casts doubt upon the validity of the lower courts' amply supported factual findings, particularly where the members of this minority did not indicate whether their lack of objection reflected their assessment of the religious significance of the high country, or their own apathy towards religious matters generally.

jury as nonconstitutional are both unjustified and ultimately unpersuasive.

## A

The Court ostensibly finds support for its narrow formulation of religious burdens in our decisions in *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136 (1987), *Thomas* v. *Review Bd.*, *Indiana Employment Security Division*, 450 U. S. 707 (1981), and *Sherbert* v. *Verner*, 374 U. S. 398 (1963). In those cases, the laws at issue forced individuals to choose between adhering to specific religious tenets and forfeiting unemployment benefits on the one hand, and accepting work repugnant to their religious beliefs on the other. The religions involved, therefore, lent themselves to the coercion analysis the Court espouses today, for they proscribed certain conduct such as munitions work *(Thomas)* or working on Saturdays *(Sherbert, Hobbie)* that the unemployment benefits laws effectively compelled. In sustaining the challenges to these laws, however, we nowhere suggested that such coercive compulsion exhausted the range of religious burdens recognized under the Free Exercise Clause.

Indeed, in *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972), we struck down a state compulsory school attendance law on free exercise grounds not so much because of the affirmative coercion the law exerted on individual religious practitioners, but because of "the *impact* that compulsory high school attendance could have on the continued survival of Amish communities." *Id.*, at 209 (emphasis added). Like respondents here, the Amish view life as pervasively religious and their faith accordingly dictates their entire lifestyle. See *id.*, at 210. Detailed as their religious rules are, however, the parents in *Yoder* did not argue that their religion expressly proscribed public education beyond the eighth grade; rather, they objected to the law because "the *values* . . . of the modern secondary school are in sharp conflict with the fundamental *mode of life* mandated by the Amish religion." *Id.*, at 217 (emphasis added). By exposing Amish children "to a

'worldly' influence in conflict with their beliefs," and by removing those children "from their community, physically and emotionally, during the crucial and formative adolescent period of life" when Amish beliefs are inculcated, *id.*, at 211, the compulsory school law posed "a very real threat of undermining the Amish community and religious practice." *Id.*, at 218. Admittedly, this threat arose from the compulsory nature of the law at issue, but it was the "impact" on religious practice itself, not the source of that impact, that led us to invalidate the law.

I thus cannot accept the Court's premise that the form of the government's restraint on religious practice, rather than its effect, controls our constitutional analysis. Respondents here have demonstrated that construction of the G–O road will completely frustrate the practice of their religion, for as the lower courts found, the proposed logging and construction activities will virtually destroy respondents' religion, and will therefore necessarily force them into abandoning those practices altogether. Indeed, the Government's proposed activities will restrain religious practice to a far greater degree here than in any of the cases cited by the Court today. None of the religious adherents in *Hobbie*, *Thomas*, and *Sherbert*, for example, claimed or could have claimed that the denial of unemployment benefits rendered the practice of their religions impossible; at most, the challenged laws made those practices more expensive. Here, in stark contrast, respondents have claimed—and proved—that the desecration of the high country will prevent religious leaders from attaining the religious power or medicine indispensable to the success of virtually all their rituals and ceremonies. Similarly, in *Yoder* the compulsory school law threatened to "undermin[e] the Amish community and religious practice," and thus to force adherents to "abandon belief . . . or . . . to migrate to some other and more tolerant region." 406 U. S., at 218. Here the threat posed by the desecration of sacred lands that are indisputably essential to

respondents' religious practices is both more direct and more substantial than that raised by a compulsory school law that simply exposed Amish children to an alien value system. And of course respondents here do not even have the option, however unattractive it might be, of migrating to more hospitable locales; the site-specific nature of their belief system renders it nontransportable.

Ultimately, the Court's coercion test turns on a distinction between governmental actions that compel affirmative conduct inconsistent with religious belief, and those governmental actions that prevent conduct consistent with religious belief. In my view, such a distinction is without constitutional significance. The crucial word in the constitutional text, as the Court itself acknowledges, is "prohibit," see *ante*, at 451, a comprehensive term that in no way suggests that the intended protection is aimed only at governmental actions that coerce affirmative conduct.[4] Nor does the Court's distinction comport with the principles animating the constitutional guarantee: religious freedom is threatened no less by governmental action that makes the practice of one's chosen faith impossible than by governmental programs that pressure one to engage in conduct inconsistent with religious beliefs. The Court attempts to explain the line it draws by arguing that the protections of the Free Exercise Clause "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development," *ibid.*,

---

[4] The Court is apparently of the view that the term "prohibit" in the Free Exercise Clause somehow limits the constitutional protection such that it cannot possibly be understood to reach " '*any* form of government action that frustrates or inhibits religious practice.' " *Ante*, at 456 (quoting *supra*, at 459) (emphasis added by majority). Although the dictionary is hardly the final word on the meaning of constitutional language, it is noteworthy that Webster's includes, as one of the two accepted definitions of "prohibit," "to prevent from doing something." Webster's Ninth New Collegiate Dictionary 940 (1983). Government action that frustrates or inhibits religious practice fits far more comfortably within this definition than does the Court's affirmative compulsion test.

for in a society as diverse as ours, the Government cannot help but offend the "religious needs and desires" of some citizens. *Ante*, at 452. While I agree that governmental action that simply offends religious sensibilities may not be challenged under the Clause, we have recognized that laws that affect spiritual development by impeding the integration of children into the religious community or by increasing the expense of adherence to religious principles—in short, laws that frustrate or inhibit religious *practice*—trigger the protections of the constitutional guarantee. Both common sense and our prior cases teach us, therefore, that governmental action that makes the practice of a given faith more difficult necessarily penalizes that practice and thereby tends to prevent adherence to religious belief. The harm to the practitioners is the same regardless of the manner in which the government restrains their religious expression, and the Court's fear that an "effects" test will permit religious adherents to challenge governmental actions they merely find "offensive" in no way justifies its refusal to recognize the constitutional injury citizens suffer when governmental action not only offends but actually restrains their religious practices. Here, respondents have demonstrated that the Government's proposed activities will completely prevent them from practicing their religion, and such a showing, no less than those made out in *Hobbie*, *Thomas*, *Sherbert*, and *Yoder*, entitles them to the protections of the Free Exercise Clause.

B

Nor can I agree with the Court's assertion that respondents' constitutional claim is foreclosed by our decision in *Bowen* v. *Roy*, 476 U. S. 693 (1986). There, applicants for certain welfare benefits objected to the use of a Social Security number in connection with the administration of their 2-year-old daughter's application for benefits, contending that such use would "rob the [child's] spirit" and thus interfere with her spiritual development. In rejecting that chal-

lenge, we stated that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own *internal affairs* in ways that comport with the religious beliefs of particular citizens." *Id.*, at 699 (emphasis added); see also *id.*, at 716–717 (STEVENS, J., concurring in part) ("[T]he Free Exercise Clause does not give an individual the right to dictate the Government's method of recordkeeping"). Accordingly, we explained that Roy could

> "no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets. The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's *internal procedures.*" *Id.*, at 700 (emphasis added).

Today the Court professes an inability to differentiate *Roy* from the present case, suggesting that "[t]he building of a road or the harvesting of timber on publicly owned land cannot meaningfully be distinguished from the use of a Social Security number." *Ante*, at 449. I find this inability altogether remarkable. In *Roy*, we repeatedly stressed the "internal" nature of the Government practice at issue: noting that Roy objected to "the widespread use of the social security number by the federal or state governments *in their computer systems,*" 476 U. S., at 697 (citation omitted; internal quotation marks omitted; emphasis added), we likened the use of such recordkeeping numbers to decisions concerning the purchase of office equipment. When the Government processes information, of course, it acts in a purely internal manner, and any free exercise challenge to such internal recordkeeping in effect seeks to dictate how the Government conducts its own affairs.

Federal land-use decisions, by contrast, are likely to have substantial external effects that government decisions con-

cerning office furniture and information storage obviously will not, and they are correspondingly subject to public scrutiny and public challenge in a host of ways that office equipment purchases are not.[5]  Indeed, in the American Indian Religious Freedom Act (AIRFA), 42 U. S. C. § 1996, Congress expressly recognized the adverse impact land-use decisions and other governmental actions frequently have on the site-specific religious practices of Native Americans, and the Act accordingly directs agencies to consult with Native American religious leaders before taking actions that might impair those practices.  Although I agree that the Act does not create any judicially enforceable rights, see *ante*, at 455, the absence of any private right of action in no way undermines the statute's significance as an express congressional determination that federal land management decisions are not "internal" Government "procedures," but are instead governmental actions that can and indeed are likely to burden Native American religious practices.  That such decisions should be subject to constitutional challenge, and potential constitutional limitations, should hardly come as a surprise.

The Court today, however, ignores *Roy*'s emphasis on the internal nature of the Government practice at issue there,

---

[5] Thus, for example, agencies proposing to use or permit activities on federal lands must comply with various public notice, consultation, and impact evaluation requirements imposed by the National Historic Preservation Act, 16 U. S. C. §§ 470f, 470h–2(f); the Archaeological Resources Protection Act, 16 U. S. C. § 470aa *et seq.;* the National Environmental Policy Act of 1969, 42 U. S. C. § 4321 *et seq.;* the Wilderness Act, 16 U. S. C. § 1131 *et seq.;* and the Federal Water Pollution Control Act, 33 U. S. C. § 1251 *et seq.*  Concededly, these statutes protect interests in addition to the religious interests Native Americans may have in a pristine environment, and of course the constitutional protection afforded those religious interests is not dependent upon these congressional enactments.  Nevertheless, the laws stand as evidence, if indeed any were needed, that federal land-use decisions are fundamentally different from government decisions concerning information management, and that, under *Roy,* this difference in external effects is of constitutional magnitude.

and instead construes that case as further support for the proposition that governmental action that does not coerce conduct inconsistent with religious faith simply does not implicate the concerns of the Free Exercise Clause. That such a reading is wholly untenable, however, is demonstrated by the cruelly surreal result it produces here: governmental action that will virtually destroy a religion is nevertheless deemed not to "burden" that religion. Moreover, in AIRFA Congress explicitly acknowledged that federal "policies and regulations" could and often did "intrud[e] upon [and] interfer[e] with" site-specific Native American religious ceremonies, Pub. L. 95–341, 92 Stat. 469, and in *Roy* we recognized that this Act—"with its emphasis on protecting the freedom to believe, express, and exercise a religion—accurately identifies the mission of the Free Exercise Clause itself." 476 U. S., at 700. Ultimately, in *Roy* we concluded that, however much the Government's recordkeeping system may have offended Roy's sincere religious sensibilities, he could not challenge that system under the Free Exercise Clause because the Government's practice did not "in any degree impair Roy's 'freedom to believe, express, and *exercise*' his religion." *Id.*, at 700–701 (quoting AIRFA, 42 U. S. C. § 1996) (emphasis added). That determination distinguishes the injury at issue here, which the Court finds so "remarkably similar" to Roy's, *ante*, at 456, for respondents have made an uncontroverted showing that the proposed construction and logging activities will impair their freedom to exercise their religion in the greatest degree imaginable, and Congress has "accurately identifie[d]" such injuries as falling within the scope of the Free Exercise Clause. The Court's reading of *Roy*, therefore, simply cannot be squared with our endorsement—in that very same case—of this congressional determination. More important, it lends no support to the Court's efforts to narrow both the reach and promise of the Free Exercise Clause itself.

## C

In the final analysis, the Court's refusal to recognize the constitutional dimension of respondents' injuries stems from its concern that acceptance of respondents' claim could potentially strip the Government of its ability to manage and use vast tracts of federal property. See *ante*, at 452–453. In addition, the nature of respondents' site-specific religious practices raises the specter of future suits in which Native Americans seek to exclude all human activity from such areas. *Ibid.* These concededly legitimate concerns lie at the very heart of this case, which represents yet another stress point in the longstanding conflict between two disparate cultures—the dominant Western culture, which views land in terms of ownership and use, and that of Native Americans, in which concepts of private property are not only alien, but contrary to a belief system that holds land sacred. Rather than address this conflict in any meaningful fashion, however, the Court disclaims all responsibility for balancing these competing and potentially irreconcilable interests, choosing instead to turn this difficult task over to the Federal Legislature. Such an abdication is more than merely indefensible as an institutional matter: by defining respondents' injury as "nonconstitutional," the Court has effectively bestowed on one party to this conflict the unilateral authority to resolve all future disputes in its favor, subject only to the Court's toothless exhortation to be "sensitive" to affected religions. In my view, however, Native Americans deserve—and the Constitution demands—more than this.

Prior to today's decision, several Courts of Appeals had attempted to fashion a test that accommodates the competing "demands" placed on federal property by the two cultures. Recognizing that the Government normally enjoys plenary authority over federal lands, the Courts of Appeals required Native Americans to demonstrate that any land-use decisions they challenged involved lands that were "central" or "indispensable" to their religious practices. See, *e. g., Northwest*

*Indian Cemetery Protective Assn.* v. *Peterson,* 795 F. 2d 688 (CA9 1986) (case below); *Wilson* v. *Block,* 228 U. S. App. D. C. 166, 708 F. 2d 735, cert. denied, 464 U. S. 956 (1983); *Badoni* v. *Higginson,* 638 F. 2d 172 (CA10 1980), cert. denied, 452 U. S. 954 (1981); *Sequoyah* v. *TVA,* 620 F. 2d 1159 (CA6), cert. denied, 449 U. S. 953 (1980); *Crow* v. *Gullet,* 541 F. Supp. 785 (SD 1982), aff'd, 706 F. 2d 856 (CA8), cert. denied, 464 U. S. 977 (1983). Although this requirement limits the potential number of free exercise claims that might be brought to federal land management decisions, and thus forestalls the possibility that the Government will find itself ensnared in a host of Lilliputian lawsuits, it has been criticized as inherently ethnocentric, for it incorrectly assumes that Native American belief systems ascribe religious significance to land in a traditionally Western hierarchical manner. See Michaelsen, American Indian Religious Freedom Litigation: Promise and Perils, 3 J. Law & Rel. 47 (1985); Pepper, Conundrum of the Free Exercise Clause—Some Reflections on Recent Cases, 9 N. Ky. L. Rev. 265, 283–284 (1982). It is frequently the case in constitutional litigation, however, that courts are called upon to balance interests that are not readily translated into rough equivalents. At their most absolute, the competing claims that both the Government and Native Americans assert in federal land are fundamentally incompatible, and unless they are tempered by compromise, mutual accommodation will remain impossible.

I believe it appropriate, therefore, to require some showing of "centrality" before the Government can be required either to come forward with a compelling justification for its proposed use of federal land or to forgo that use altogether. "Centrality," however, should not be equated with the survival or extinction of the religion itself. In *Yoder,* for example, we treated the objection to the compulsory school attendance of adolescents as "central" to the Amish faith even though such attendance did not prevent or otherwise render the practice of that religion impossible, and instead simply

threatened to "undermine" that faith. Because of their perceptions of and relationship with the natural world, Native Americans consider all land sacred. Nevertheless, the Theodoratus Report reveals that respondents here deemed certain lands more powerful and more directly related to their religious practices than others. Thus, in my view, while Native Americans need not demonstrate, as respondents did here, that the Government's land-use decision will assuredly eradicate their faith, I do not think it is enough to allege simply that the land in question is held sacred. Rather, adherents challenging a proposed use of federal land should be required to show that the decision poses a substantial and realistic threat of frustrating their religious practices. Once such a showing is made, the burden should shift to the Government to come forward with a compelling state interest sufficient to justify the infringement of those practices.

The Court today suggests that such an approach would place courts in the untenable position of deciding which practices and beliefs are "central" to a given faith and which are not, and invites the prospect of judges advising some religious adherents that they "misunderstand their own religious beliefs." *Ante*, at 458. In fact, however, courts need not undertake any such inquiries: like all other religious adherents, Native Americans would be the arbiters of which practices are central to their faith, subject only to the normal requirement that their claims be genuine and sincere. The question for the courts, then, is not whether the Native American claimants understand their own religion, but rather whether they have discharged their burden of demonstrating, as the Amish did with respect to the compulsory school law in *Yoder*, that the land-use decision poses a substantial and realistic threat of undermining or frustrating their religious practices. Ironically, the Court's apparent solicitude for the integrity of religious belief and its desire to forestall the possibility that courts might second-guess the

claims of religious adherents leads to far greater inequities than those the Court postulates: today's ruling sacrifices a religion at least as old as the Nation itself, along with the spiritual well-being of its approximately 5,000 adherents, so that the Forest Service can build a 6-mile segment of road that two lower courts found had only the most marginal and speculative utility, both to the Government itself and to the private lumber interests that might conceivably use it.

Similarly, the Court's concern that the claims of Native Americans will place "religious servitudes" upon vast tracts of federal property cannot justify its refusal to recognize the constitutional injury respondents will suffer here. It is true, as the Court notes, that respondents' religious use of the high country requires privacy and solitude. The fact remains, however, that respondents have never asked the Forest Service to exclude others from the area. Should respondents or any other group seek to force the Government to protect their religious practices from the interference of private parties, such a demand would implicate not only the concerns of the Free Exercise Clause, but also those of the Establishment Clause as well. That case, however, is most assuredly not before us today, and in any event cannot justify the Court's refusal to acknowledge that the injuries respondents will suffer as a result of the Government's proposed activities are sufficient to state a constitutional cause of action.

## III

Today, the Court holds that a federal land-use decision that promises to destroy an entire religion does not burden the practice of that faith in a manner recognized by the Free Exercise Clause. Having thus stripped respondents and all other Native Americans of any constitutional protection against perhaps the most serious threat to their age-old religious practices, and indeed to their entire way of life, the Court assures us that nothing in its decision "should be read to encourage governmental insensitivity to the religious

needs of any citizen." *Ante*, at 453. I find it difficult, however, to imagine conduct more insensitive to religious needs than the Government's determination to build a marginally useful road in the face of uncontradicted evidence that the road will render the practice of respondents' religion impossible. Nor do I believe that respondents will derive any solace from the knowledge that although the practice of their religion will become "more difficult" as a result of the Government's actions, they remain free to maintain their religious beliefs. Given today's ruling, that freedom amounts to nothing more than the right to believe that their religion will be destroyed. The safeguarding of such a hollow freedom not only makes a mockery of the "'policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the[ir] traditional religions,'" *ante*, at 454 (quoting AIRFA), it fails utterly to accord with the dictates of the First Amendment.

I dissent.