# Religious Objections to the Postal Service Oath of Office

Section 1011 of title 39 of the United States Code specifies an oath of office that all Postal Service officers and employees must take. Title VII of the Civil Rights Act of 1964 does not require the Postal Service to depart from the dictates of section 1011 in order to accommodate (beyond what is required by section 1011) prospective employees who raise bona fide religious objections to taking this oath.

The Religious Freedom Restoration Act does not require any further accommodation in response to three common objections to taking this oath.

February 2, 2005

MEMORANDUM OPINION FOR THE VICE PRESIDENT AND GENERAL COUNSEL
UNITED STATES POSTAL SERVICE

Congress has long required that all officers and employees of the United States Postal Service, before entering into any duties or receiving any salary, take and subscribe a set oath. Its words are now specified in 39 U.S.C. § 1011 (2000). That statute allows a prospective employee to "affirm" rather than "swear" the oath but does not otherwise provide for alteration. You have asked whether, and if so under what circumstances, the Postal Service is required either by Title VII of the Civil Rights Act of 1964 or by the Religious Freedom Restoration Act ("RFRA") to depart from the dictates of section 1011 in order to further accommodate prospective employees who raise bona fide religious objections to taking this oath. We first conclude that Title VII does not require any further accommodation, because it does not permit any departure from a federal statutory mandate. We also conclude that RFRA does not require any further accommodation in response to three common objections: without questioning the sincerity of the religious views behind those objections, we nevertheless conclude from an analysis of the terms of the statutory oath that, properly understood, the oath does not in those circumstances burden a person's exercise of religion.[1]

## I.

Since the Civil War, Congress has mandated a set oath of office as a condition precedent for employment with the federal government, including employment in the Post Office, and this oath has included the pledges that one will "support and defend the Constitution of the United States, against all enemies, foreign and domestic" and "bear true faith and allegiance to the same." *See* An Act to prescribe an Oath of Office, and for other Purposes, ch. 128, 12 Stat. 502, 502 (1862);

---

[1] It is conceivable that, under some additional objection, the oath could be said to substantially burden a particular person's exercise of religion; should the Postal Service conclude that that has happened, RFRA may, depending on the details of the objection, require a limited accommodation.

*see also* An Act to amend the Laws relating to the Post-Office Department, ch. 71, § 2, 12 Stat. 701, 701–02 (1863) (adding to this oath for all persons employed by Post Office). As Attorney General Speed wrote of the Civil War era statutes, "the ability to take the oath, and the fact that the oath is taken, are qualifications as well for employe[e]s and contractors as for officers in the Post Office Department." *Le Baron's Case*, 11 Op. Att'y Gen. 498, 500 (1866). The present general oath for federal officers appears at 5 U.S.C. § 3331 (2000). Congress has separately specified the oath for the Postal Service, in 39 U.S.C. § 1011, although it is identical (but for omitting the concluding sentence, "So help me God"). Section 1011 requires as follows:

> Before entering upon their duties and before receiving any salary, all officers and employees of the Postal Service shall take and subscribe the following oath or affirmation:
>
> "I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter."

From time to time, the Postal Service faces religious objections to this requirement. We understand from you and the Civil Division of this Department that three objections in particular recur. First, some prospective employees object to affirming that they will "support . . . the Constitution," stating that they object to placing allegiance to a temporal power above allegiance to God. Second, others object to affirming that they will "defend the Constitution," stating that they object to promising to take up arms or use force in defense of the country. Third, still others object to affirming that they will "bear true faith and allegiance" to the Constitution, stating that they object to placing allegiance to a temporal power above allegiance to God. *See* Letter for M. Edward Whelan III, Acting Assistant Attorney General, Office of Legal Counsel, from Mary Anne Gibbons, Vice President, General Counsel, United States Postal Service at 2 (May 29, 2003) ("May USPS Letter") (explaining that "great majority" of objections involve "support" and "defend"); Memorandum for Jack Goldsmith, Assistant Attorney General, Office of Legal Counsel, from Peter D. Keisler, Assistant Attorney General, Civil Division at 2 (Oct. 23, 2003) ("Civil Division Memo") (including "true faith and allegiance" as among the "most typical objections" and describing objection as same as objection to "support"); *see also Anderson v. Frank*, No. 91-C-292, slip op. at 2 (E.D. Wis. Nov. 20, 1992) (rejecting Title VII challenge to Postal Service oath, involving claims that "defend" suggested military service and "true faith and allegiance" suggested "devotion to an entity other than God").

Initially, you asked only whether Title VII, 42 U.S.C. §§ 2000e–2000e-17 (2000), requires the Postal Service to accommodate religious objections. *See* Letter for Jay Bybee, Assistant Attorney General, Office of Legal Counsel, from Mary Anne Gibbons, Vice President, General Counsel, United States Postal Service at 2 (Apr. 25, 2003) ("April USPS Letter"). Subsequently, you asked that we also consider RFRA, 42 U.S.C. §§ 2000bb–2000bb-4 (2000). *See* May USPS Letter at 2. Because of the involvement of the Civil Division and the Equal Employment Opportunity Commission ("EEOC") in the *Anderson* case cited above, we have solicited and received their views, although the EEOC has formally limited its views to "the application of Title VII." Letter for Howard C. Nielson, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, from Peggy R. Mastroianni, Associate Legal Counsel, EEOC at 1 n.1 (Jan. 8, 2004). The Civil Rights Division of this Department and the Office of Personnel Management did not submit views in response to our requests. We first address Title VII and then turn to RFRA.

## II.

The section of Title VII regulating employment by the federal government provides that "[a]ll personnel actions affecting employees or applicants for employment . . . in the United States Postal Service . . . shall be made free from any discrimination based on . . . religion." 42 U.S.C. § 2000e-16(a).[2] Although this language does not plainly require accommodation of religious practice—as opposed to simply prohibiting affirmative "discrimination based on" such practice—Congress, as the Supreme Court has explained, has "incorporated [such a requirement] into the statute, somewhat awkwardly, in the definition of religion." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986). That definition provides as follows: "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).[3] Title VII thus, through

---

[2] A provision in the Postal Reorganization Act provides: "Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with . . . employees . . . shall apply to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a) (2000). Subsection (b) does not list Title VII as applying. Subsequent to enacting section 410, however, Congress amended Title VII to include the language quoted in the main text, expressly applying it to the Postal Service. Although Congress did not then also amend section 410, it is well established that Title VII applies to the Postal Service. *See, e.g., Loeffler v. Frank*, 486 U.S. 549 (1988); *see also Grandison v. USPS*, 696 F. Supp. 891, 894 (S.D.N.Y. 1988) (explaining the history).

[3] Part of the awkwardness (although not at issue in *Ansonia*) is the arguable exclusion of the federal government from this definition, because Title VII excludes "the United States" from its definition of "employer." 42 U.S.C. § 2000e(b). But the Postal Service does not contend that section 2000e(j) does

the interaction of these two sections, is understood to require federal employers in "[a]ll personnel actions" to "reasonably accommodate to" an employee's religious practices, unless so accommodating would impose "undue hardship." *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977) (explaining that "the employer's statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship, is clear"). Any accommodation that would cause an employer to bear "more than a *de minimis* cost" imposes "undue hardship." *Id.* at 84; *see Ansonia*, 479 U.S. at 67 (same). And the cost need not be economic. *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 134–35 (1st Cir. 2004).

Title VII does not require (or permit) the Postal Service, in response to religious objections, to depart from the oath of office mandated by 39 U.S.C. § 1011, because for the Postal Service to violate a federal statute would impose "undue hardship" as a matter of law. Nothing in the relevant provisions of Title VII either expressly or implicitly provides for the disregard of a congressional mandate in the name of reasonably accommodating to religious practices: Section 2000e(j) contains no "notwithstanding any other law" language; nor does it otherwise suggest that it overrides other federal law, such as RFRA does by expressly "appl[ying] to all Federal law," 42 U.S.C. § 2000bb-3(a). *Cf. TWA*, 432 U.S. at 79 (holding that, in absence of "a clear and express indication from Congress" to the contrary, it would cause undue hardship under section 2000e(j) for an employer to violate "an agreed-upon seniority system" in an "otherwise valid" collective bargaining contract). Furthermore, as you have noted, *see* April USPS Letter at 2, the Postal Service, as a component of the Executive Branch of the federal government, has a background constitutional duty, derivative from the President's, to take care that the laws be faithfully executed. *See* U.S. Const. art. II, § 3. The Postal Service oath is and long has been among those laws and thus within that duty, and we see no basis in the text of Title VII for discerning any implicit intent to alter that oath's express obligation.

The presidential guidelines that we discuss more fully in our RFRA analysis in the next part take the same view. In addressing Title VII's requirement of reasonable accommodation, they recognize that undue hardship is imposed if the accommodation "would cause an actual cost to the agency or to other employees or an actual disruption of work, *or . . . is otherwise barred by law*." Office of the Press Secretary, The White House, *Guidelines on Religious Exercise and Religious Expression in the Federal Workplace* § 1.C (Aug. 14, 1997) ("1997 Guidelines," or "Guidelines") (emphasis added).

---

not apply, and courts repeatedly have applied its obligation to the Postal Service. *E.g.*, *Mann v. Frank*, 7 F.3d 1365, 1368–70 (8th Cir. 1993); *Am. Postal Workers Union v. Postmaster Gen.*, 781 F.2d 772, 774–75 (9th Cir. 1986) (per curiam). We therefore assume for purposes of this memorandum that section 2000e(j) applies.

The courts in similar circumstances have uniformly understood section 2000e(j) in this way. The issue has arisen most frequently with prospective employees' religiously based refusals to provide social security numbers, notwithstanding federal requirements to do so. The Ninth Circuit in *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (1999), held that "accommodation would cause 'undue hardship' as a matter of law," *id.* at 831, laying down the rule "that an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law," *id.* at 830. *Sutton* reaffirmed *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382 (9th Cir. 1984), in which the court had held that it would cause undue hardship to accommodate a Sikh machinist's practice of wearing a beard, because doing so would expose the employer to liability under state workplace safety rules.[4] *See also EEOC v. Sambo's of Ga.*, 530 F. Supp. 86 (N.D. Ga. 1981) (similar, involving state food service rules). The Eighth Circuit in *Seaworth v. Pearson*, 203 F.3d 1056 (2000) (per curiam), followed *Sutton* in holding that accommodating an objection to providing one's social security number would cause undue hardship because it would violate the Internal Revenue Code. *Id.* at 1057. The Fourth and Tenth Circuits also have taken the same view. *See Baltgalvis v. Newport News Shipbuilding Inc.*, 132 F. Supp. 2d 414, 419 (E.D. Va.) ("Courts have consistently agreed that an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law."), *aff'd*, 15 F. App'x 172, 2001 WL 912673, at *1 (4th Cir. Aug. 14, 2001) (per curiam) (affirming on reasoning of district court); *Weber v. Leaseway Dedicated Logistics, Inc.*, 5 F. Supp. 2d 1219, 1223 (D. Kan. 1998) ("undue hardship is shown if an accommodation would cause the employer to violate the law"), *aff'd*, 166 F.3d 1223, 1999 WL 5111, at *1 (10th Cir. Jan. 7, 1999) (per curiam) (affirming on this ground); *see also EEOC v. Allendale Nursing Ctr.*, 996 F. Supp. 712, 717–18 (W.D. Mich. 1998) (finding undue hardship in social security number case).[5]

---

[4] The question whether it would cause "undue hardship" to violate a law is distinct from the question whether, as some courts have held, Title VII requires accommodation of employees subject to union shop agreements who conscientiously object to paying union dues. *See, e.g.*, *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1242 (9th Cir. 1981). Federal law merely permits union shop agreements that require collection of union dues; it does not require them.

[5] Many of the cited cases also have held, in the alternative, that an employer's mere compliance with a governmental mandate is not an employment requirement (in the words of section 2000e-16(a), a "personnel action[]") and therefore cannot form the basis for a prima facie case. *See Seaworth*, 203 F.3d at 1057 ("the IRS, not defendants, imposed the requirement"); *Baltgalvis*, 132 F. Supp. 2d at 418–19 ("the requirement that Ms. Baltgalvis provide her SSN to her employer is one imposed by federal law and merely implemented by" the employer); *Allendale Nursing*, 996 F. Supp. at 717 ("Rhoads' dispute is with the IRS or SSA, not with her employer."). *See also* Civil Division Memo at 6 ("Title VII governs adverse personnel actions, not statutes."). But in *Sutton* and *Weber*, although the district courts followed this rule, the courts of appeals did not affirm on this ground, merely holding that accommodation would impose undue hardship. *See Sutton*, 192 F.3d at 830–31; *Weber*, 1999 WL 5111, at *1.

One might argue that the rule of these cases depends on the exposure of an accommodating employer to potential liability, whereas the Postal Service would not (as far as we are aware) face any liability for failing to enforce fully the oath that section 1011 requires. We reject any such argument. The Tenth and Ninth Circuits have done the same, at least implicitly. The Tenth Circuit in *Weber* bifurcated its analysis, first holding that "[r]equiring Defendant to violate these laws in order to accommodate Plaintiff would result in undue hardship," 1999 WL 5111, at *1, and then separately holding that requiring "an employer to subject itself to potential fines *also* results in undue hardship," *id*. at *2 (emphasis added). The Ninth Circuit in *Sutton* stated the rule without mentioning possible liability, and quoted only the former part of *Weber*. 192 F.3d at 830–31. No court has suggested that it would have decided differently had the employer not faced potential liability, and the courts have easily rejected arguments that the hardship from disregarding another law was de minimis even when the burden of accommodating would have been minimal: In social security cases, the employer could apply for a waiver from the requirement to submit a number, would apparently face only a $50 penalty for violating it, and might be able to avoid the requirement by treating the plaintiff as an independent contractor. *See Seaworth*, 203 F.3d at 1057–58; *Baltgalvis*, 132 F. Supp. 2d at 419; *Allendale Nursing*, 996 F. Supp. at 717–18; *see also Hommel v. Squaw Valley Ski Corp.*, 89 F. App'x 650, 2004 WL 473956, at *1 (9th Cir. Mar. 11, 2004) (per curiam) (applying rule of *Sutton*). Moreover, even if these cases had turned on potential civil liability, we would not lightly conclude that it was a de minimis cost for a part of the federal government to disregard a federal law, even if it suffered no quantifiable cost for doing so.

## III.

Having concluded that Title VII does not require the Postal Service to accommodate religious objections to the oath that section 1011 mandates, we consider whether RFRA requires any such accommodation. RFRA provides that "Government shall not *substantially burden* a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a *compelling governmental interest*; and (2) is the *least restrictive means* of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b) (emphases added). After determining that RFRA applies to the Postal Service's enforcement of the oath statute, we explain that, in three common objections that you and the Civil Division have identified, the oath, properly interpreted, does not in fact "substantially burden" the religious views at issue and therefore that RFRA does

---

Although the existence of a prima facie case is a question analytically prior to that of the imposition of undue hardship, we decline to reach it, given that the rule regarding undue hardship is sufficient to resolve your question.

not require an accommodation in those situations. We then explain how the Postal Service should address any other bona fide religious objections that it may receive, concluding that, if a substantial burden should be shown, the Postal Service would have a compelling interest in imposing the oath but may, as the least restrictive means of furthering the governmental interest, need to make a limited modification, guided by the principles that we outline.

### A.

RFRA broadly applies to the "Government," which includes not only entities but also officers of those entities and persons acting under color of law, *see id*. § 2000bb-2(1), and "to all Federal law, and the implementation of that law, whether statutory or otherwise," regardless of its date of enactment, *id*. § 2000bb-3(a). The Postal Service is part of the federal government, *see, e.g.*, 39 U.S.C. § 201 (2000) (creating Postal Service as an "establishment of the executive branch of the Government of the United States"), and thus part of the "Government" for purposes of RFRA. And the oath that 39 U.S.C. § 1011 requires is a federal statutory law. By the terms of the statute, then, RFRA would seem to apply to the Postal Service's obligations under section 1011.[*]

On the mere question whether RFRA applies, *Brown v. GSA*, 425 U.S. 820 (1976), does not color the interpretation of the relevant statutory text, quoted above, and that text is broad and clear. Furthermore, the 1997 Guidelines resolve any doubt in the affirmative. They provide that "where an agency's work rule imposes a substantial burden on a particular employee's exercise of religion, the agency . . . should grant the employee an exemption from that rule, unless the agency has a compelling interest in denying the exemption and there is no less restrictive means of furthering that interest," *id*. § 1.C, and that "[i]n the Federal Government workplace, if neutral workplace rules . . . impose a substantial burden on a particular employee's exercise of religion, [RFRA] requires the employer to grant the employee an exemption from that neutral rule, unless the employer has a compelling interest in denying an exemption and there is no less restrictive means of furthering that interest," *id*. § 2.E. *See also id*. § 2.B (including RFRA in discussion of law governing federal hiring and firing).

---

[*] Editor's Note: The published version of this opinion omits two paragraphs, which reflect the views of the Civil Division and which are protected by the deliberative process privilege. Neither paragraph is necessary for the discussion here, which is limited to the applicability of RFRA and which does not address the separate issue of the remedies that may or may not be available to federal employees under RFRA. *Cf. Francis v. Mineta*, 505 F.3d 266, 270, 272 (3d Cir. 2007) (holding the applicability of RFRA's legal standard does not answer the separate question of which statute provides the appropriate remedial scheme, and that Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, "provides the exclusive remedy for job-related claims of federal religious discrimination").

When issued in 1997, the Guidelines plainly bound the internal operations of the civilian Executive Branch. The President of the United States, in whom "[t]he executive Power" is "vested," U.S. Const. art. II, § 1, announced their issuance. Remarks Announcing Guidelines on Religious Exercise and Religious Expression in the Federal Workplace (Aug. 14, 1997), 2 *Pub. Papers of Pres. William J. Clinton* 1102 (1997). He simultaneously issued a memorandum "directing the heads of executive departments and agencies . . . to comply with the *Guidelines*" and admonishing "[a]ll civilian executive branch agencies, officials, and employees [to] follow [them] carefully." Memorandum on Religious Exercise and Religious Expression in the Federal Workplace (Aug. 14, 1997), 2 *Pub. Papers of Pres. William J. Clinton* 1104, 1104 (1997). The Guidelines were apparently distributed that day—at his direction—by the Office of Personnel Management, *see id*. at 1103, 1104, and they were posted on the White House website.

The 1997 Guidelines still apply. Presidential directives do "not automatically lapse upon a change of administration," but rather, "unless otherwise specified . . . remain effective until subsequent presidential action is taken." *Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000). They "remain in force, unless otherwise specified, pending any future presidential action." *Id*. Although the Guidelines were not published in the Federal Register, this omission does not appear to affect their continuing force. *See id*. Nothing in the Guidelines or the issuing materials "otherwise specifie[s]" that the President intended a limited duration, and we are aware of no "presidential action" to revoke them.[6]

### B.

In order for any duty of accommodation to arise under RFRA, a governmental action must "substantially burden" a person's "exercise of religion." 42 U.S.C. § 2000bb-1(b).[7] RFRA indicates, in Congress's findings, that it seeks through this language and the rest of its requirements to codify the standard that the Supreme Court applied to claims under the Free Exercise Clause of the Constitution's First Amendment beginning with *Sherbert v. Verner*, 374 U.S. 398 (1963), and continu-

---

[6] The Guidelines appeared at www.whitehouse.gov/WH/New/html/19970819-3275.html, which now leads to a message stating that the file cannot be found and that "many files associated with the previous administration have been removed." They remain available at www.fedlabor.org/LR_News/religion.htm.

Editor's Note: The Guidelines are no longer available at either link but, as of October 1, 2014, can be found at http://clinton2.nara.gov/WH/New/html/19970819-3275.html.

[7] RFRA defines "exercise of religion" as "religious exercise," 42 U.S.C. § 2000bb-2(4), which the cross-referenced Religious Land Use and Institutionalized Persons Act defines to "include[ ] any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id*. § 2000cc-5(7)(A) (2000).

ing up to, but excluding, *Employment Division v. Smith*, 494 U.S. 872 (1990). *See* 42 U.S.C. § 2000bb.

A governmental action does not impose a *substantial* burden for purposes of RFRA if it imposes *no* burden because it does not actually conflict with an individual's religious exercise. As the Court during that pre-*Smith* period observed: "It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303 (1985). The Court rejected a claim that being required to receive the minimum wage "would violate the religious convictions" of the purported volunteers of a religious organization who objected to receiving a cash wage (rather than just benefits), because the labor statute, as its definition of "wage" established, "does not require the payment of cash wages." The imposition of the requirement therefore would not have burdened this religious tenet. *Id*. at 303–04. The Court similarly rejected a claim that imposing the statute's recordkeeping requirement would burden the volunteers' religion, because that claim "rests on a misreading of the Act," which imposed no such requirement on the volunteers. *Id*. at 304 n.27. Of course, the government generally may not inquire into a person's religious beliefs, apart from determining that they are in fact "religious" and are sincerely held. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 713–16 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 209, 215–16 (1972); *see also Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 833 (1989) ("States are clearly entitled to assure themselves that there is an ample predicate for invoking the Free Exercise Clause."). But as the Court's analysis in *Alamo* indicates, the government may objectively evaluate the alleged intersection between a given bona fide religious belief and the governmental action, and determine whether they in fact conflict.

Because there is no actual conflict, no substantial burden exists under RFRA when prospective employees raise any of the three common objections to the Postal Service oath of office described in Part I. As explained there, persons have objected to pledging to (1) "support . . . the Constitution," (2) "defend the Constitution," and (3) "bear true faith and allegiance to" the Constitution on the ground that doing so would violate their sincerely held religious views. When these terms are properly understood, however, it is clear that the oath does not conflict with the particular views involved and thus does not impose a burden on persons raising these objections. As the Civil Division puts it: "There is no doubt that the fundamental tenets of some religions forbid military service or placing an allegiance to a temporal power over God. . . . [T]he reason why there is no burden on religion here . . . is that applicants who object to the oath are mistaken in thinking that it asks them to violate these tenets of their religion." Civil Division Memo at 4. Or, as the Court put it in similar circumstances: "We . . . fail to perceive how application of the" oath statute "would interfere with [applicants']

right to freely exercise their religious beliefs." *Alamo*, 471 U.S. at 304–05. We consider each of these phrases of the oath in turn.

First, pledging that one will "support . . . the Constitution of the United States against all enemies, foreign and domestic," 39 U.S.C. § 1011, does not burden the religious exercise of persons who object to subordinating their allegiance to God to their allegiance to a temporal power. This phrase says nothing of one's relation to God and in fact lists only temporal enemies.

Instead, the "support" phrase requires only that a person abide by the nation's constitutional system of government and its laws. In *Bond v. Floyd*, 385 U.S. 116 (1966), the Supreme Court explained that a provision of a Georgia oath—requiring state legislators to affirm that they "support[ed] the Constitution of this State and of the United States"—simply called for a willingness to abide by our "constitutional processes of government." *Id*. at 129, 135. The Court reiterated this view in *Cole v. Richardson*, 405 U.S. 676 (1972), noting that such language merely paraphrases the oath that the Constitution requires for all federal and state legislators and officers—who must be "bound by Oath or Affirmation to support this Constitution," U.S. Const. art. VI, cl. 3—and pointing out that even justices dissenting in prior oath cases had agreed that a "support" oath merely "requires an individual assuming public responsibilities to affirm . . . that he will endeavor to perform his public duties lawfully." 405 U.S. at 682 (citation omitted). The Court "recognized that the purpose leading legislatures to enact such oaths . . . was not to create specific responsibilities but to assure that those in positions of public trust were willing to commit themselves to live by the constitutional processes of our system." *Id*. at 684. In sum, "the connotatively active word 'support' has been interpreted to mean simply a commitment to abide by our constitutional system." *Id*.

Second, pledging that one will "defend the Constitution against all enemies, foreign and domestic," as section 1011 requires, does not burden the religious exercise of persons who object to resorting to arms. It makes no mention of arms or war. Rather, the phrase is the mirror of the pledge to "support" the Constitution: One promises not only to "support" the Constitution generally, but also—in a manner not specified—to oppose those who do not "support" it. "Support and defend," used together, are effectively a unitary phrase.

Again, the Supreme Court has made this clear. In *Girouard v. United States*, 328 U.S. 61 (1946), just after the close of World War II, the Court interpreted the naturalization oath's similar pledge—that one will "defend the Constitution and laws of the United States of America against all enemies, foreign and domestic"— as not precluding the naturalization of an alien who, as a Seventh-Day Adventist, refused to take up arms in defense of the country. *See id*. at 62 (quoting former 8 U.S.C. § 735(b)). The oath did not "in terms require that [aliens] promise to bear arms. Nor has Congress expressly made any such finding a prerequisite to citizenship." *Id*. at 64. The Court was unwilling to "read [such a requirement] into the Act by implication," in part because of the nation's long history of providing

exemptions from military service for conscientious objectors: "we could not assume that Congress intended to make such an abrupt and radical departure from our traditions unless it spoke in unequivocal terms." *Id*.; *see also id*. at 66–67 (similar). Congress had, through such exemptions, recognized "that even in time of war one may truly *support and defend* our institutions though he stops short of using weapons of war." *Id*. at 67 (emphasis added). In *Cole*, the Court further concluded that "defend" does not require military service as a non-combatant. A state oath of office required employees to pledge to "uphold and defend the Constitution of the United States of America" and to "oppose the overthrow of the government of the United States of America . . . by force, violence, or by any illegal or unconstitutional method." 405 U.S. at 677–78 (footnote omitted). In sustaining the oath against a free speech challenge, the Court explained that such language "was simply a recognition that ours is a government of laws and not of men" and "involved an affirmation of organic law and rejection of the use of force to overthrow the government." *Id*. at 682–83 (internal quotation marks and footnote omitted). The Court found the "uphold and defend" clause "indistinguishable from the oaths that this Court has recently approved," including in *Bond*. *Id*. at 683.

This interpretation finds further support in the present naturalization oath statute, which expressly continues the tradition that *Girouard* invoked. The statute requires separate pledges to "support and defend" and "to bear arms," while allowing alternative formulations of the latter—and only the latter—for any person "opposed to the bearing of arms in the Armed Forces of the United States by reason of religious training and belief." One alternative involves "noncombatant service"; the other involves "work of national importance under civilian direction." 8 U.S.C. § 1448(a) (2000). Thus, Congress itself has indicated that it does not understand "defend" to refer to military service.

Finally, pledging that one will "bear true faith and allegiance to" the Constitution does not burden the exercise of religion of persons who object to subordinating their allegiance to God to their allegiance to the United States. Although the quoted phrase arguably presents a closer question than "support," properly understood it simply reinforces the immediately preceding "support and defend" clause, by requiring that one pledge an honest and faithful commitment to the Constitution as opposed to *other temporal powers*—not as opposed to God. This reading too finds support in the naturalization oath statute, as well as in the Constitution's Test Oath Clause and the related tradition.

Congress has mandated a pledge containing the following elements, among others, for the naturalization oath: "(2) to renounce and abjure absolutely and entirely *all allegiance and fidelity* to any foreign prince, potentate, state, or sovereignty of whom or which the applicant was before a subject or citizen; (3) to *support and defend* the Constitution and the laws of the United States against all enemies, foreign and domestic; [and] (4) to *bear true faith and allegiance* to the same." *Id*. (emphases added). The similarity between the phrases "bear true faith

and allegiance" and "renounce . . . all allegiance and fidelity" suggests that both relate only to temporal powers (given that the latter phrase plainly does), and that "faith" is used in the sense of faithfulness, rather than in the sense of belief or with any reference to one's religious obligations. *Cf. Girouard*, 328 U.S. at 64 ("Refusal to bear arms is not necessarily a sign of *disloyalty or a lack of attachment* to our institutions. One may serve his country *faithfully and devotedly*, though his religious scruples make it impossible for him to shoulder a rifle.") (emphases added); 4 U.S.C. § 4 (2000) (Pledge of Allegiance, including pledge of "allegiance" to country "under God"). In addition, the sequence of these three elements suggests that a promise to "bear true faith and allegiance" to the Constitution is the culmination of, and thus similar in kind to, the preceding pledges: One turns *away* from one's prior association with another temporal power; then turns *toward* the Constitution of the United States in lieu of the former power; and then, finally, promises to be steadfast in that turning. This understanding of "bear true faith and allegiance" in context is why the Court could describe an oath containing "support," "defend," and "bear true faith and allegiance" as "in no material respect different from" an oath simply to "support" the Constitution. *Girouard*, 328 U.S. at 65.

The Test Oath Clause, which immediately follows and qualifies the Constitution's requirement of a "support" oath, compels the same interpretation. That clause mandates that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const. art. VI, cl. 3. *See Biklen v. Bd. of Educ.*, 333 F. Supp. 902, 908 (N.D.N.Y. 1971) ("There is no doubt that the free exercise of religion was in the framers' mind at this point—the oath was mandated but religious tests were proscribed."), *aff'd*, 406 U.S. 951 (1972). To read the phrase "bear true faith and allegiance" in the Postal Service oath as requiring a pledge to subordinate one's allegiance to God to his allegiance to the government would be to read the oath as "probing religious beliefs," *Torcaso v. Watkins*, 367 U.S. 488, 494 (1961), and thus effectively imposing a religious test (more precisely, an *anti*-religious test). Because "[t]he test oath is abhorrent to our tradition," we should not find that Congress imposed one by implication, in an oath that does not clearly do so. *See Girouard*, 328 U.S. at 69.

Even apart from the specifics of the Test Oath Clause—*Torasco*, for example, technically rested on the Free Exercise Clause, *see* 367 U.S. at 496, as it struck down a *state* test oath—to interpret the phrase "bear true faith and allegiance" as indicating anything at all regarding one's attitude or loyalty to God would bring it into conflict with longstanding tradition in the United States against requiring a person to place allegiance to country above allegiance to God. As James Madison famously put it in his *Memorial and Remonstrance*, written on the eve of the Framing:

> Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe: And if a member of Civil Society, who enters into any subordinate

> Association, must always do it with a reservation of his duty to the General Authority; much more must every man who becomes a member of any particular Civil Society, do it *with a saving of his allegiance to the Universal Sovereign*.

James Madison, *Memorial and Remonstrance Against Religious Assessments*, *in* 8 *The Papers of James Madison* 298, 299 (1785) (Robert A. Rutland et al. eds., 1973) (emphasis added). The Court in *Girouard* reiterated this understanding and applied it to an oath: "'the history of the struggle for religious liberty, the large number of citizens of our country from the very beginning who have been unwilling to sacrifice their religious convictions, and, in particular, those who have been conscientiously opposed to war and *who would not yield what they sincerely believed to be their allegiance to the will of God*'—these considerations make it impossible to conclude 'that such persons are to be deemed disqualified for public office in this country because of the requirement of the oath . . . .'" 328 U.S. at 65 (Hughes, C.J., dissenting) (quoting *United States v. Macintosh*, 283 U.S. 605, 633 (1931) (emphasis added)); *see also id*. at 68 ("Throughout the ages men have suffered death *rather than subordinate their allegiance to God* to the authority of the State.") (emphasis added).

For the foregoing reasons, the Postal Service oath does not conflict with the religious views at issue in the three objections that you and the Civil Division have described. Section 1011 therefore does not, under RFRA, impose a substantial burden on the religious exercise of a person raising one of those objections, and RFRA therefore does not require or permit the Postal Service to depart from section 1011 in response to them.[8]

## C.

A prospective employee could of course raise an objection to the Postal Service oath based on other sincere religious views. In addressing such an objection, the Postal Service will need to apply the elements of RFRA, considering (1) whether the statutory oath, properly interpreted, actually and substantially burdens the applicant's bona fide exercise of religion, such that the Postal Service must consider an accommodation, 42 U.S.C. § 2000bb-1(a); and (2) if the oath does impose a substantial burden on that applicant, whether that burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest," *id*. § 2000bb-1(b). Although we cannot answer the first question in the abstract, below we provide some guidance

---

[8] The Postal Service has met with "considerable success" by attempting to explain the oath's meaning to applicants who raise objections. *See* May USPS Letter at 2. Such efforts perpetuate "our happy tradition of 'avoiding unnecessary clashes with the dictates of conscience.'" *Gillette v. United States*, 401 U.S. 437, 453 (1971) (citations omitted).

for addressing it. Whatever the details of a particular substantial burden that might be shown, however, the Postal Service would have a compelling interest in requiring an oath of office to ensure a prospective employee's support for the Constitution and commitment faithfully to discharge his duties. In considering in a particular case whether the oath as Congress has written it is the least restrictive means of furthering that compelling interest, the Postal Service, in light of that interest, may not dispense with the statutory oath altogether and should proceed consistently with the principles that we set out below in concluding this subpart. In addition, the Postal Service should feel free to contact us for further guidance when an objection other than one of the three detailed above arises.

The question whether a person would be substantially burdened in the exercise of his religion by having to take the statutory oath—notwithstanding religious objections to some or all of it—in order to obtain employment with the Postal Service is not an easy one to answer, particularly in the abstract. But the general contours of that standard are fairly well established, and the 1997 Guidelines touch on the question.

*Sherbert* indicated that a governmental action that is otherwise neutral toward religion substantially burdens a person's exercise of religion if the action can be analogized to "a fine imposed . . . for" that exercise. 374 U.S. at 404; *see Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988) (contrasting "indirect coercion or penalties" with "incidental effects of government programs," and noting inexact "line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs").[9] The leading Supreme Court exposition of the *Sherbert* standard is from *Thomas*, in which the Court struck down the denial of unemployment benefits to a person who quit his private sector job for religious reasons:

> Where the state conditions receipt of an important benefit upon con-
> duct proscribed by a religious faith, or where it denies such a benefit
> because of conduct mandated by religious belief, thereby putting
> substantial pressure on an adherent to modify his behavior and to vi-
> olate his beliefs, a burden upon religion exists. While the compulsion
> may be indirect, the infringement upon free exercise is nonetheless
> substantial.

---

[9] Any law that did target religion as such presumably would be invalid under the Free Exercise Clause even post-*Smith*, regardless of the substantiality of the burden. *See Sherbert*, 374 U.S. at 402; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–33 (1993). Cases addressing such oaths of office, *see Torcaso*, 367 U.S. 488 (pre-*Sherbert*, oath requiring belief in God held to violate Free Exercise Clause), or similar requirements, *see Rutan v. Republican Party*, 497 U.S. 62, 76–79 (1990) (post-*Smith*, free speech challenge to patronage hiring held to state claim), are thus outside the *Sherbert* framework and not dispositive under RFRA.

450 U.S. at 717–18; *see Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987) (similar, employing this language); *see also, e.g.*, *United States v. Lee*, 455 U.S. 252, 257 (1982) (concluding that obligation to pay social security taxes substantially burdened Amish); *Yoder*, 406 U.S. at 218 (concluding that misdemeanor statute compelling school attendance substantially burdened Amish). As a circuit court applying this case law under RFRA recently summarized: "A statute burdens the free exercise of religion if it 'put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs,' including when it 'results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution.' A substantial burden must be more than an 'inconvenience.'" *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002) (citations omitted); *see also Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 19–22 (1st Cir. 2004); *Henderson v. Kennedy*, 253 F.3d 12, 16–17 (D.C. Cir.), *reh'g denied*, 265 F.3d 1072, 1073–74 (2001).

In addition, the President has, through the 1997 Guidelines, interpreted RFRA such that an oath of office could, in some circumstances, impose a substantial burden and require modification of the oath—an interpretation that, as explained in the previous subpart, binds the Executive Branch. In the subsection discussing the general rules concerning accommodation of religious exercise, and after setting out the elements of RFRA, the Guidelines provide the following example: "An applicant for employment in a governmental agency who is a Jehovah's Witness should not be compelled, contrary to her religious beliefs, to take a loyalty oath whose form is religiously objectionable." Guidelines § 1.C, ex. (b). The details of the hypothetical religious objection and burden (including possible accommodations) are not provided, and different Jehovah's Witnesses may have different sincere beliefs, *see, e.g.*, *Thomas*, 450 U.S. at 711, 715–16, including regarding oaths, *see Bessard v. Cal. Cmty. Colls.*, 867 F. Supp. 1454 (E.D. Cal. 1994).[10] The Postal Service, in considering possible burdens, should proceed consistently with these *Guidelines* as long as they remain in force, as well as with the general caselaw we have set out above.

Should the Postal Service conclude that a substantial burden exists in a particular case, there would nevertheless be a compelling interest in ensuring, including through an oath, that prospective employees both supported the Constitution and were committed to faithfully performing their jobs. The clear evidence of the compelling interest in ensuring support for the Constitution through an oath is the inclusion of such a requirement in the Constitution, not only for members of Congress and principal officers but also for "all judicial and executive officers," both federal and state, and all state legislators. Such persons "shall be bound by

---

[10] The objection in *Bessard*, although not entirely clear, appears to have been to professing *any* sort of faith or allegiance to a temporal power, even if subordinate to one's faith and allegiance to God. *See* 867 F. Supp. at 1456–58, 1462, 1465. It was therefore distinct from the objection we discussed in Part III.B.

Oath or Affirmation, to support this Constitution." U.S. Const. art. VI, cl. 3. The Constitution itself, in the Fourteenth Amendment, emphasizes the importance of this requirement by making certain actions that are inconsistent with the oath— "engag[ing] in insurrection or rebellion against" the Constitution, or giving "aid or comfort to the enemies thereof"—and done by one who had "previously taken" it the basis for barring him from holding any state or federal office. *Id*. amend. XIV, § 3. And the First Congress demonstrated the requirement's importance by implementing it through its very first enactment. *See* An Act to regulate the Time and Manner of administering certain Oaths, ch. 1, § 1, 1 Stat. 23, 23 (1789).

The courts have similarly recognized that the Founders' inclusion of the requirement of a "support" oath in the Constitution (and of a slightly different oath for the President) reflects a governmental interest of the highest order. As the Supreme Court explained in *American Communications Association v. Douds*:

> Clearly the Constitution permits the requirement of oaths by office-holders to uphold the Constitution itself. The obvious implication is that those unwilling to take such an oath are to be barred from public office. For the President, a specific oath was set forth in the Constitution itself. Art. II, § 1. And Congress has detailed an oath for other federal officers. Obviously the Framers of the Constitution thought that the exaction of an affirmation of minimal loyalty to the Government was worth the price of whatever deprivation of individual freedom of conscience was involved.

339 U.S. 382, 415 (1950) (footnote omitted). The court in *Biklen*, affirmed by the Supreme Court, *see* 406 U.S. at 951, described a "support" oath for state teachers as "uniquely constitutional since it is mandated by the United States Constitution itself," and quoted a pre-Civil War case explaining that both the inclusion of the oath requirement and its placement as "'the last and closing clause of the Constitution'" demonstrated the Founders' "'anxiety to preserve [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority.'" 333 F. Supp. at 907 (quoting *Ableman v. Booth*, 62 U.S. (21 How.) 506, 524 (1859)).

The oath at issue in *Biklen*, like that required by section 1011, also included a pledge to "faithfully discharge" one's duties. *See id*. at 903 n.1. The court, after acknowledging *Sherbert*, recognized a compelling interest in both clauses, treating them together: "That the state has a compelling interest in assuring the fitness and dedication of its teachers is a self-evident proposition. Accordingly, it may demand that those aspiring to labor in the sensitive area of the classroom be willing to affirm their support of its government systems" through such a "promissory" oath that "does not inquire into one's present beliefs, political or religious. . . . Likewise, the state, like any employer, has the right (and obligation) to require that its employees give assurance of their willingness to perform their duties to the best of their ability." *Id*. at 909. The state was denying the plaintiff a

job as a teacher not because she was a Quaker, but because she refused to affirm her support and her commitment to "do her best as a teacher. The state has a demonstrable and compelling interest that she at least do this." *Id*.; *see id*. at 906–07 (similar). *See also Cole*, 405 U.S. at 681 (recognizing that Court has "upheld the constitutionality of oaths, addressed to the future, promising constitutional support in broad terms").

The *Biklen* court's discussion of the compelling governmental interest in a pledge to "faithfully discharge" one's duties is reinforced by the long pedigree of such oaths in the United States. *Cf. Personal Satisfaction of Immigration and Nationality Act Oath Requirement*, 21 Op. O.L.C. 72, 74 (1997) (in concluding, under the Rehabilitation Act, that personally taking the naturalization oath is an "essential" requirement for naturalization, noting that, since 1790, "Congress always has required some form of an oath of allegiance"). Although the Constitution mandates an oath to "faithfully execute" one's duties only on the President, *see* U.S. Const. art. II, § 1, cl. 8, Congress in establishing the first executive departments consistently required, in addition to the constitutionally mandated "support" oath, that all officers and employees also pledge to faithfully execute their duties. *E.g.*, An Act for establishing an Executive Department, to be denominated the Department of Foreign Affairs, ch. 4, § 3, 1 Stat. 28, 29 (1789) ("well and faithfully . . . execute"); An Act to establish an Executive Department, to be denominated the Department of War, ch. 7, § 3, 1 Stat. 49, 50 (1789) ("well and faithfully . . . execute"); An Act to establish the Post-Office and Post Roads within the United States, ch. 7, § 4, 1 Stat. 232, 234 (1792) ("faithfully perform," and abstain from anything forbidden by postal laws); *see also* An Act to regulate the Time and Manner of administering certain Oaths, 1 Stat. at 24 (similar for initial congressional officers).

This dual compelling interest in ensuring minimal loyalty and conscientious conduct plainly includes the Postal Service, many of whose employees have unique access both to the mail—which contains valuable items such as social security checks, tax returns, and correspondence—and to public and private buildings. *See United States v. Lamb*, 6 F.3d 415, 421 (7th Cir. 1993) ("a government employee who takes an oath to uphold the law (as does a mail carrier) and who performs a government function for a public purpose such as delivery of the U.S. mail, is in a position of trust"); *USPS v. Am. Postal Workers Union*, 736 F.2d 822, 825 (1st Cir. 1984) ("Any postal position which handles mail is one entrusted with items of importance and value by the public. Envelopes containing government checks or items which are insured disclose to all who see them the valuable items inside."); *USPS v. Nat'l Ass'n of Letter Carriers*, 631 F. Supp. 599, 601 (D.D.C. 1986) ("The inexorability of the mails, upon which literally millions depend daily, is equally compromised whether postal workers are derelict in their duties for reasons of avarice, indolence, or distractive vices . . . ; the mails are simply too important.").

Given this compelling interest, should the Postal Service conclude, in light of pre-*Smith* caselaw and the 1997 Guidelines, that a substantial burden exists in a particular case, it also would need to consider the "least restrictive means" of furthering that interest. Without attempting to conduct that analysis in the abstract, we believe that at least the following three principles should be considered. First, as the Constitution indicates, the key phrase in a loyalty oath is that one will "support this Constitution." Only for the President does the Constitution indicate a need for greater obligations in this area, requiring him to pledge that he "will to the best of my Ability, *preserve, protect and defend* the Constitution of the United States." U.S. Const. art. II, § 1, cl. 8 (emphasis added). The cases addressing loyalty oaths likewise focus on the "support" language. When an oath contains additional or different language addressing the subject, the courts effectively read it as if it contained only the "support" language. In *Girouard*, the Court took an oath essentially identical to the first half of the Postal Service oath, with both "support and defend" and "bear true faith and allegiance," and interpreted it as "in no material respect different from" the constitutional oath. 328 U.S. at 65–66; *see Cole*, 405 U.S. at 682–84 (same with "uphold and defend" oath); *see also Biklen*, 333 F. Supp. at 909–10; *Bessard*, 867 F. Supp. at 1465.

Second, the Constitution already provides one—but only one—accommodation of its requirement of a "support" oath: It allows a would-be official to "affirm" rather than "swear." (The Postal Service oath allows the same alternative, as do the general definitions of "oath" and "sworn" in 1 U.S.C. § 1 (2000).) This constitutional accommodation suggests that others, which would lead to an oath less burdensome than the one that the Constitution itself requires, would not adequately further the interest.

Third, both *Biklen* and the early statutes, discussed above, suggest that the Postal Service oath's "faithfully discharge" clause is as essential as the "support" language to furthering the compelling interest. The consistent practice of Congress—since the 1790s—in requiring at least a pledge of faithful performance from prospective Post Office officers and employees (in addition to the support oath) reinforces this understanding. *See* An Act to establish the Post-Office and Post Roads within the United States, 1 Stat. at 234 (1792); An Act to establish the Post-office and Post-roads within the United States, ch. 23, § 4, 1 Stat. 354, 358 (1794); An Act to establish the Post-Office of the United States, ch. 43, § 2, 1 Stat. 733, 733 (1799); An Act regulating the Post-office Establishment, ch. 37, § 2, 2 Stat. 592, 593–94 (1810); An Act to reduce into one the several acts establishing and regulating the Post-office Department, ch. 64, § 2, 4 Stat. 102, 103 (1825).

C. KEVIN MARSHALL
*Acting Deputy Assistant Attorney General*
*Office of Legal Counsel*