# SUPREME COURT OF THE UNITED STATES

APACHE STRONGHOLD *v.* UNITED STATES, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 24–291.   Decided May 27, 2025

The petition for a writ of certiorari is denied. JUSTICE ALITO took no part in the consideration or decision of this petition.

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, dissenting from the denial of certiorari.

For centuries, Western Apaches have worshipped at Chí'chil Biłdagoteel, or Oak Flat. They consider the site a sacred and "direct corridor to the Creator." Pet. for Cert. 8. It is a place where tribal members conduct "religious ceremonies that cannot take place elsewhere." *Ibid.* Recognizing Oak Flat's significance, the government has long protected both the land and the Apaches' access to it.

No more. Now, the government and a mining conglomerate want to turn Oak Flat into a massive hole in the ground. To extract copper lying beneath the land, they plan to blast tunnels that will result in a crater perhaps 1,000 feet deep and nearly two miles wide. 101 F. 4th 1036, 1131 (CA9 2024) (en banc) (Murguia, C. J., dissenting). "It is undisputed" that the government's plan will permanently "destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise" at Oak Flat. *Id.*, at 1129.

Seeking to halt the destruction of the Apaches' sacred site, Apache Stronghold, a nonprofit organization, sued under the Religious Freedom Restoration Act of 1993 (RFRA). That law prevents the federal government from "substantially burden[ing] a person's exercise of religion," unless

that burden represents "the least restrictive means of fur-thering [a] compelling governmental interest."  107 Stat. 1488, 42 U. S. C. §2000bb–1(b)(2).  In a sharply divided en banc decision, the Ninth Circuit rejected Apache Strong-hold's challenge.  Though the government's plan will result in the destruction of an ancient sacred site, the Ninth Cir-cuit reasoned, that plan does "not impose a substantial bur-den on religious exercise."  101 F. 4th, at 1044 (*per curiam*).

Apache Stronghold asks us to review the Ninth Circuit's extraordinary conclusion.  But the Court today turns aside the group's request.  Respectfully, that is a grave mistake. This case meets every one of the standards we usually apply when assessing petitions for certiorari:  The decision below is highly doubtful as a matter of law, it takes a view of the law at odds with those expressed by other federal courts of appeals, and it is vitally important.  Before allowing the government to destroy the Apaches' sacred site, this Court should at least have troubled itself to hear their case.

I

A

Oak Flat is home to "old-growth oak groves, sacred springs, burial locations, and a singular concentration of ar-chaeological sites testifying to its persistent use for the past 1,500 years."  Pet. for Cert. 6.  Western Apaches believe that the site is the dwelling place of the Ga'an—"saints" or "holy spirits" that lie at "the very foundation of [their] religion." App. to Pet. for Cert. 871a.  The Ga'an "live and breathe" in Oak Flat.  *Ibid.*  "They come from the ground," and they serve as "messengers between Usen, the Creator, and [Apaches] in the physical world."  *Id.*, at 983a.

Faithful to these beliefs, tribal members have worshipped at Oak Flat for centuries, conducting there a number of re-ligious ceremonies that cannot take place anywhere else. Pet. for Cert. 8.  One example, the "Sunrise Ceremony," is a multiday coming-of-age ceremony for young women.  *Ibid.*

GORSUCH, J., dissenting

In the ceremony, a young woman's "godmother dresses her in the essential tools of becoming a woman, and tribal members surround her with singing, dancing, and prayer." *Ibid.* (internal quotation marks and alteration omitted).

The ceremony depends on Oak Flat in many ways. It requires the Apache girl coming of age to gather certain plants from Oak Flat—plants Apaches believe to have the "spirit of Chí'chil Biłdagoteel." App. to Pet. for Cert. 975a. The Ga'an later "come from the mountains," *id.*, at 982a–983a, "enter Apache men called crown dancers," and "bless the girl," Pet. for Cert. 10. On the third day of the ceremony, the girl is painted with white clay from the ground at Oak Flat. The clay represents the Apache creation story, in which a "white-painted woman came out of the earth, covered with white ash from the earth's surface." App. to Pet. for Cert. 883a. When an Apache girl is painted with the white clay, "[i]t molds her into the woman she is going to be," and she is "'imprint[ed]' with the spirit of Oak Flat." *Id.*, at 981a–982a; Pet. for Cert. 11. Her godmother wipes the clay from her eyes, and the girl is "reborn," "transform[ed] into womanhood." App. to Pet. for Cert. 977a.



Pet. for Cert. 11.

Tribal members believe the destruction of Oak Flat "will close off a portal to the Creator forever and will completely devastate the Western Apaches' spiritual lifeblood." 519 F. Supp. 3d 591, 604 (Ariz. 2021). For the women who came of age at Oak Flat in particular, that means their ties to Chí'chil Biłdagoteel, and "to all of the [girls] past, present, who have had their Sunrise Ceremony there," will be severed. App. to Pet. for Cert. 977a. Absent that connection, Apache women say, they "can't call [them]selves Apache." *Ibid.* Without "the spirit of Chi'chil Bildagoteel . . . there's nothing. There's nothing at all." *Id.*, at 984a.

B

Though Oak Flat sits on federal land today, it was not always so. Once, Western Apaches enjoyed a vast territory that embraced Oak Flat. See C. Royce, Indian Land Cessions in the United States, H. R. Doc. No. 736, 56th Cong., 1st Sess., 922 (1899) (Royce). With time, of course, others laid claim to the land. Among those was the nation of Mexico. For a period, it asserted rights to large swaths of what is now the American Southwest. That changed after the Mexican-American War, when Mexico ceded its claims by treaty to the United States in 1848. See Pet. for Cert. 12; Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, Feb. 2, 1848, 9 Stat. 922 (Treaty of Guadalupe Hidalgo).

A few years later, the United States and the Apaches signed a treaty of their own. In it, the United States promised that it would "at its earliest convenience designate, settle, and adjust . . . territorial boundaries" with the Apaches. Treaty with the Apaches, Art. 9, July 1, 1852, 10 Stat. 980 (Treaty of Santa Fe). But the "U. S. never formally complied with" that promise. Royce 789. Instead, many years of conflict, known as the Apache Wars, followed. See R. Ogle, Federal Control of the Western Apaches, 1848–1886, p. 242 (1970); App. to Pet. for Cert. 963a. Eventually, the government forced the Apaches onto reservations, and they "lost large portions of their homelands, including Oak Flat." App. to Pet. for Cert. 858a–859a.

Beginning in the 20th century, however, the government took some steps to protect the site. First, in 1905, the government created the Tonto National Forest, of which Oak Flat forms a part. *Id.*, at 827a; 101 F. 4th, at 1129. Then, in 1955, President Eisenhower reserved a portion of Oak Flat to protect it from mining. See 20 Fed. Reg. 7336–7337. Later, President Nixon renewed that protection. 36 Fed. Reg. 19029 (1971). And as recently as 2016, the National Park Service added Oak Flat to the National Register of

Historic Places, in part because of the site's significance to tribal members. See Pet. for Cert. 13.

Those protections started coming under pressure in 1995 with the discovery of a copper deposit thousands of feet beneath Oak Flat. App. to Pet. for Cert. 687a. Seeking to exploit that resource, two multinational mining companies, Rio Tinto and BHP, joined forces to form Resolution Copper, and together they began lobbying Congress for permission to mine the site. Pet. for Cert. 13. Over the ensuing two decades, various Members of Congress proposed at least 12 separate standalone bills aimed at requiring the government to transfer Oak Flat to Resolution Copper. 101 F. 4th, at 1045, n. 1. Following hearings and testimony from tribal members, however, each of those pieces of legislation failed. *Ibid.*, n. 2.

That experience eventually led Resolution Copper and its congressional allies to try a different tack. Every year, Congress passes a bill called the National Defense Authorization Act (NDAA). Some call it "must-pass" legislation. 101 F. 4th, at 1128 (Murguia, C. J., dissenting). In 2014, the NDAA was 698 pages long and authorized hundreds of billions of dollars in defense spending. See Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, 128 Stat. 3292; see also H. R. Rep. No. 113–446, pt. 2, p. 2 (2014). To that bill, legislators attached "a last-minute rider" regarding the exploitation of Oak Flat. See §3003, 128 Stat. 3732; Reply to Brief in Opposition 10–11.

That provision, called the Land Exchange Act, sought to accomplish several things. It authorized the government to transfer Oak Flat to Resolution Copper in exchange for other scattered parcels of land. See §§3003(b)(2), (b)(4), (c)(1), (d)(1), 128 Stat. 3732–3737. It revoked the orders by Presidents Eisenhower and Nixon protecting the area from mining. §3003(i)(1)(A), *id.*, at 3740. And it directed the Secretary of Agriculture to prepare an environmental impact

statement (EIS). §3003(c)(9)(B), *id*., at 3735–3736. After completing the EIS, the government must "convey all right, title, and interest" in Oak Flat to Resolution Copper within "60 days." §3003(c)(10), *id*., at 3736–3737.

In January 2021, the Department of Agriculture published an EIS. See App. to Pet. for Cert. 685a. In it, the Department explained that Resolution Copper's mining activities, using a technique called panel caving, would result in a crater "between 800 and 1,115 feet deep and roughly 1.8 miles across." *Id*., at 690a. The Department admitted that Oak Flat would "be directly and permanently damaged by the subsidence area." *Id*., at 698a–699a. Indeed, the Apaches tell us, the planned crater overlaps almost entirely with the area sacred to them.



Pet. for Cert. 15.

Acknowledging that the planned destruction of Oak Flat would cause "indescribable hardship" to tribal members, App. to Pet. for Cert. 701a, the Department considered alternative mining techniques. But it rejected those alterna-

tives, concluding that, while other "underground tech-
niques" could "technically be applied," they would "substan-
tially reduce the amount of ore that could be profitably
mined." *Id*., at 931a, 934a.

Now, the planned destruction of Oak Flat appears immi-
nent. Though the Department withdrew its initial EIS
shortly after issuing it in 2021, the government represents
that it intends to publish a final EIS on June 16, 2025, and
transfer the land to Resolution Copper on or shortly after
that date. See Letter from D. Sauer, Solicitor General, to
S. Harris, Clerk of Court (Apr. 21, 2025).

C

Seeking to halt the transfer and destruction of Oak Flat,
Apache Stronghold filed suit under RFRA in 2021 when the
Department was preparing to publish its initial EIS. Pet.
for Cert. 16. After the district court denied its motion for a
preliminary injunction, Apache Stronghold took its case to
the Ninth Circuit, where years of litigation followed.

The first round of that litigation culminated in a split
panel decision rejecting Apache Stronghold's RFRA claim.
The panel began by observing that RFRA prevents the fed-
eral government from "'substantially burden[ing]' a per-
son's sincere exercise of religion," unless that burden is
"'the least restrictive means of furthering'" a "'compelling
governmental interest.'" 38 F. 4th 742, 752 (2022) (quoting
42 U. S. C. §§2000bb–1(a), (b)). And because the govern-
ment did not dispute that "Apache Stronghold's members
seek to exercise sincere religious beliefs by holding ceremo-
nies on Oak Flat," the panel recognized, the first critical
question it faced concerned whether the government's pro-
posed land transfer and mining plans would "substantially
burden" the Apaches' religious exercises. 38 F. 4th, at 752.

To answer that question, a majority of the panel turned
for guidance to an earlier Ninth Circuit case, *Navajo Nation*
v. *United States Forest Serv.*, 535 F. 3d 1058 (2008) (en

banc). There, the Ninth Circuit had held that burdens on religious exercise qualify as "substantial" in two—and only two—circumstances: (1) "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," and (2) when individuals are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Id.*, at 1070. Applying that test to Apache Stronghold's claim, the majority concluded that the government's plans would not substantially burden tribal members' religious exercises. Those plans may "mak[e] worship on Oak Flat 'impossible.'" 38 F. 4th, at 757. But, the majority reasoned, the government's plans did not force tribal members to reject their faith and thus did not offend RFRA. Disagreeing with the majority's understanding of *Navajo Nation* and its application to Apache Stronghold's claim, Judge Berzon dissented. *Id.,* at 773.

That, however, did not prove the Ninth Circuit's last word on the matter. After the panel ruled, the court agreed to rehear Apache Stronghold's case en banc. And, at the culmination of those proceedings, a majority of the en banc court announced its decision to overrule *Navajo Nation*. For purposes of RFRA, the majority held, a "substantial burden" on religious exercise isn't limited to the two categories discussed in that case. "[P]reventing access to religious exercise" also qualifies. 101 F. 4th, at 1043 (*per curiam*).

You might think that decision would have marked a significant victory for the Apaches. After all, the destruction of Oak Flat would "prevent" them from conducting religious exercises, including ones they believe can occur nowhere else. But rather than end its analysis there, a different and closely divided 6-to-5 majority of the en banc court proceeded to articulate a special exception to the rule the court had just recognized. While the phrase "substantial burden" generally reaches actions that "preven[t] access to religious exercise," *ibid.*, the majority said, that rule does not apply

to actions involving "a disposition of government real property," *id.*, at 1055. And for that reason, the Ninth Circuit once again denied Apache Stronghold's request for relief.

How the en banc court arrived at its conclusion is a story of its own. The court began by reciting some legal history involving the Free Exercise Clause of the First Amendment. *Id.*, at 1056–1058. In cases like *Sherbert* v. *Verner*, 374 U. S. 398 (1963), and *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972), the Ninth Circuit observed, this Court asked whether the government's challenged action imposed a substantial burden on religion, whether that burden served a compelling interest, and whether the government's chosen means were narrowly tailored. Later, the Ninth Circuit continued, this Court upended that approach in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), by holding that *Sherbert* and *Yoder*'s test for Free Exercise claims does not apply to challenged governmental actions that are "'neutral'" toward and among religions and "generally applicable" to all persons. 494 U. S., at 878–879. Later still, the Ninth Circuit noted, Congress expressed displeasure with *Smith*, adopted RFRA, and in doing so effectively guaranteed the *Sherbert* and *Yoder* test would be applied "in all cases where free exercise of religion is substantially burdened." 42 U. S. C. §2000bb(b)(1).

After laying out this history, the Ninth Circuit introduced a wrinkle that, in its estimation, bore dramatically on RFRA's meaning. The court pointed to another pre-*Smith* case, *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439 (1988). That case involved a First Amendment challenge to a plan to construct a road on federal land near sacred tribal sites. *Id.*, at 443. On the Ninth Circuit's telling, *Lyng* set forth a special test for analyzing whether the government's "disposition" of its real property runs afoul of the Free Exercise Clause. 101 F. 4th, at 1055. That test, the Ninth Circuit said, permits the government to do

as it pleases with its property as long as it has no "tendency to coerce individuals into acting contrary to their religious beliefs" and does not "discriminat[e]" against or among religious adherents. *Id.*, at 1051 (internal quotation marks omitted). In the Ninth Circuit's view, what counts as a "substantial burden" under RFRA "must be construed in light of" this Court's pre-*Smith* First Amendment jurisprudence and thus must be understood to "subsum[e], rather than abrogat[e], the holding of *Lyng.*" 101 F. 4th, at 1063.

The upshot? Through this long series of moves, the Ninth Circuit concluded that the government *usually* imposes a substantial burden on religious exercise when it prevents that exercise. But, thanks to *Lyng*, a *different* rule applies when it comes to the "disposition" of the government's real property. 101 F. 4th, at 1055. In that setting, the Ninth Circuit held, a substantial burden arises only when the government coerces people into defying their religious beliefs or discriminates between religions. *Id.*, at 1055, 1063. And, the Ninth Circuit reasoned, Apache Stronghold could not satisfy that standard because the government's plan does not force anyone to reject their religious beliefs and does not discriminate among religions. To be sure, the government's plan may promise the destruction of a sacred site and thus prevent religious exercises from occurring. But, the court reasoned, none of that is enough to amount to a substantial burden under RFRA when the "disposition" of federal land is involved. *Id.*, at 1053, 1063.

## II

The Ninth Circuit's extraordinary holding easily merits this Court's attention. It is far from obviously correct. It poses a question of exceptional importance. And it implicates a circuit split. Simply put, this case meets every one of the standards we generally apply when assessing petitions seeking our review. See this Court's Rule 10.

A

Start with the question whether the Ninth Circuit erred. There are many reasons to think it did. Consider just a few of them.

First, the Ninth Circuit's interpretation of the phrase "substantial burden" is difficult to reconcile with the statutory text. As a matter of ordinary meaning, after all, an action that prevents a religious exercise does not just burden that exercise substantially, it burdens it completely. Even the Ninth Circuit seemed to recognize as much, acknowledging that, as a rule, the government imposes a substantial burden on religious exercises when it "prevent[s]" them entirely. 101 F. 4th, at 1043 (*per curiam*); *id.*, at 1052; see also *id.*, at 1091, 1104 (R. Nelson, J., concurring).

Exactly nothing in the phrase "substantial burden"—or anything else in RFRA's text—hints that a different and more demanding standard applies when (and only when) the "disposition" of the government's property is at issue. *Id.*, at 1055, 1063. To the contrary, RFRA proceeds to define the "exercise of religion" to include "[t]he use . . . of real property for the purpose of religious exercise." 42 U. S. C. §§2000bb–2, 2000cc–5(7)(B). The statute adds that its demands apply to "all" of "Federal law," without regard to subject matter. §2000bb–3(a). And the statute provides that "nothing" in its provisions "shall be construed to authorize any government to burden any religious belief." §2000bb–3(c). In each of these ways, RFRA's terms suggest that a law disposing of federal real property is to be treated like any other.

Second, while RFRA may have sought to restore some of this Court's pre-*Smith* First Amendment jurisprudence, we have never held that the statute should be construed to "subsum[e]" that jurisprudence wholesale. 101 F. 4th, at 1061. Far from it. In *Burwell* v. *Hobby Lobby Stores*, for example, the government argued that RFRA's use of the phrase "exercise of religion" should be understood to reach

only those religious practices this Court had recognized to be protected by the First Amendment before *Smith*. See 573 U. S. 682, 713 (2014). But this Court emphatically rejected that notion, describing its implications as "absurd" and explaining that, "by enacting RFRA, Congress went far beyond what this Court ha[d] held [to be] constitutionally required" before *Smith*. 573 U. S., at 706, 714–716. Similarly, in *Holt* v. *Hobbs*, a lower court invoked this Court's pre-*Smith* First Amendment decisions to hold that a prison regulation prohibiting inmates from growing beards did not "substantially burden" religious exercise under the Religious Land Use and Institutionalized Persons Act (RLUIPA), RFRA's "sister statute." 574 U. S. 352, 356, 361 (2015). But, again, this Court firmly rejected that course, holding that the lower court had "improperly imported a strand of reasoning" from First Amendment decisions into a distinct statutory setting that guarantees "greater protection." *Id.*, at 361.

Third, even taken on its own terms, it is hard to see how *Lyng* can be read as setting forth a special test for determining when a government's "disposition" of land represents a "substantial burden" on religion. Just search *Lyng* for the phrase "substantial burden." You will not find it. Nor did *Lyng* involve a challenge to a governmental plan that seeks to destroy a religious site, as the government's plan for Oak Flat would. Instead, that case concerned a plan to build a road near religious sites that promised to generate noise and considerable disruption, but that also promised to leave those sites standing. 485 U. S., at 442, 444, 454. In rejecting a First Amendment challenge to the government's plan in *Lyng*, the Court took pains to stress that point, and the fact that the government's actions would not "*prohibit*" religious exercises. *Id.*, at 452 (emphasis added).

To be sure, *Lyng* also stressed that the government's plan

at issue there did not "discriminate" against or among religions. *Id.*, at 453. And later, in *Smith*, this Court read *Lyng* to support its view that the government does not violate the Free Exercise Clause when its actions are "neutral" toward and among religions and "generally applicable." 494 U. S., at 881, 883. But none of that has any bearing here. As we have seen, the fact that the government acts pursuant to a neutral and generally applicable law is not enough to satisfy RFRA. Even in those circumstances, the government may not impose a "substantial burden" on religious exercise unless it has a compelling reason to do so and employs the least restrictive means to further that interest.

Fourth, at bottom, it seems the Ninth Circuit was concerned that a ruling for Apache Stronghold would effectively afford tribal members a "'religious servitude'" on federal land at Oak Flat. 101 F. 4th, at 1052. And, the argument goes, those who adopted RFRA could not have intended to afford Tribes or others that kind of power over the disposition of federal property. Brief for Federal Respondents in Opposition 16. But unexpressed legislative intentions are not the law. And even if we were to abandon the statutory text in favor of guesswork about unenacted congressional purposes, it is far from clear why we should make the guess the Ninth Circuit did.

The truth is, Congress has adopted all sorts of laws restricting the government's power to dispose of its real property. Take just one example, the Endangered Species Act. That law, this Court once held, required the government to halt "operation of a virtually completed federal dam" to protect the endangered "snail darter," a "previously unknown species of perch." *TVA* v. *Hill*, 437 U. S. 153, 156, 158 (1978). The Court read the Act to require that result even though Congress had spent more than $100 million on the dam—nearly half a billion in today's dollars—and our holding effectively "'divest[ed] the Government of its right to use what is, after all, *its* land.'" 101 F. 4th, at 1051 (quoting

*Lyng*, 485 U. S., at 453). If Congress went to such lengths to accommodate the snail darter, why should we suppose it offered less protection to people practicing an ancient faith?

## B

Not only does the Ninth Circuit's decision merit our review because it rests on questionable legal footing. Review is all the more warranted because that decision implicates both a vital question and a circuit split.

No one before us disputes the significance of this case. Nor could anyone sensibly do so. As the government has made plain, it intends to clear the way for Resolution Copper to begin the destruction of Oak Flat imminently. Letter from D. Sauer, Solicitor General, to S. Harris, Clerk of Court (Apr. 21, 2025). The effects of the government's plan promise to be "immediate, permanent, and large in scale." App. to Pet. for Cert. 912a. An ancient sacred site will be destroyed, replaced by a 2-mile-wide crater. The Apaches tell us, without contradiction, that the destruction of Oak Flat will prevent them from conducting religious exercises that cannot take place anywhere else. Pet. for Cert. 8. Indeed, they say, the government's plan will effectively "end Apache religious existence as we know it." *Id.*, at 40. Even the government has acknowledged that the destruction of Oak Flat will inflict "indescribable hardship" on the Apaches. App. to Pet. for Cert. 869a.

But if tribal members will suffer the most, they will hardly be alone. The Ninth Circuit's decision promises to affect many others too. Take the Knights of Columbus. For 60 years, they held Mass on Memorial Day in Virginia's Poplar Grove National Cemetery. Pet. for Cert. 36. But after the Ninth Circuit's decision in this case, the National Park Service invoked that court's reasoning, denied permission for the Mass in 2023, and argued that the Knights suffered "'no burden'" under RFRA from the discontinuation

of their longstanding worship. *Ibid.* (quoting Brief for De-
fendants in *Knights of Columbus* v. *National Park Service*,
No. 3:24–cv–363 (ED Va., May 22, 2024), ECF Doc. 21, pp.
20–21). Though the Park Service eventually relented after
litigation ensued, seemingly nothing would prevent it from
trying its hand again so long as the Ninth Circuit's decision
stands. Nor would anything appear to prevent the govern-
ment from prohibiting worship at Ebenezer Baptist Church
where Martin Luther King, Jr., preached, or at the many
other historic churches situated on federal land. See Pet.
for Cert. 37.

Perhaps unsurprisingly, the Ninth Circuit's decision in
this case stands as an outlier. Not a single other Court of
Appeals has suggested that the "substantial burden" test in
RFRA or its sister statute RLUIPA contains anything like
the Ninth Circuit's special rule for the "disposition" of gov-
ernment property. To the contrary, one court after another
has held that preventing a religious exercise is, necessarily,
a "substantial burden" on that religious exercise. As Chief
Judge Sutton has succinctly put it, "[t]he greater restriction
(barring access to the practice) includes the lesser one (sub-
stantially burdening the practice)." *Haight* v. *Thompson*,
763 F. 3d 554, 565 (CA6 2014); see also *Yellowbear* v. *Lam-
pert*, 741 F. 3d 48, 56 (CA10 2014); *Bethel World Outreach
Ministries* v. *Montgomery Cty. Council*, 706 F. 3d 548, 555–
556 (CA4 2013); *West* v. *Radtke*, 48 F. 4th 836, 845, n. 3
(CA7 2022); *In re Young*, 82 F. 3d 1407, 1418 (CA8 1996);
*Thai Meditation Assn. of Ala., Inc.* v. *Mobile*, 980 F. 3d 821,
830–831 (CA11 2020).

Yet, even if no other circuit ever follows the Ninth Cir-
cuit's lead, its outlying rule will have outsized effects. That
circuit encompasses approximately 74% of all federal land
and almost a third of the nation's Native American popula-
tion. Pet. for Cert. 36. Thanks in large measure to these
facts, every circuit decision over the last three decades ad-
dressing RFRA sacred-site claims has come "from the Ninth

Circuit." Reply to Brief in Opposition 5–6. As a practical matter, then, if allowed to stand, the Ninth Circuit's holding below will govern most (if not all) RFRA sacred-site disputes in this country.

*

While this Court enjoys the power to choose which cases it will hear, its decision to shuffle this case off our docket without a full airing is a grievous mistake—one with consequences that threaten to reverberate for generations. Just imagine if the government sought to demolish a historic cathedral on so questionable a chain of legal reasoning. I have no doubt that we would find that case worth our time. Faced with the government's plan to destroy an ancient site of tribal worship, we owe the Apaches no less. They may live far from Washington, D. C., and their history and religious practices may be unfamiliar to many. But that should make no difference. "Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove this country's commitment to . . . religious freedom." *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. 617, 649 (2018) (GORSUCH, J., concurring).